In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 05-4035

VICTOR E. SEPULVEDA, *et al.*,

*Petitioners*,

*v.*

ALBERTO R. GONZALES,

*Respondent.*

---

On Petition to Review an Order of the
Board of Immigration Appeals.
Nos. A95 399 058, -070, -154

---

ARGUED AUGUST 9, 2006—DECIDED OCTOBER 2, 2006

---

Before POSNER, COFFEY, and EASTERBROOK, *Circuit Judges.*

POSNER, *Circuit Judge.* Victor Sepulveda is a native of Colombia and worked in its Attorney General's Office, where he had access to confidential information concerning investigations of the insurgents who plague that nation. The information included the names of employees of the Office assigned to the investigations, their aliases, and the names and locations of witnesses whom the Office guards. Between 1996 and 2001, according to Sepulveda's testimony, 100 AG

personnel were killed by insurgents and another 36 kidnapped by them.

Joined by his wife and daughter, Sepulveda sought asylum in the United States on the ground that he faces a threat of being persecuted as a former employee of the Attorney General's Office (he does not plan to return to the Office if he is sent back to Colombia). The immigration judge rejected the asylum claim mainly on the ground that persecution on account of being an employee of the Attorney General's Office is not a ground for asylum, and the Board of Immigration Appeals summarily affirmed.

To qualify for asylum, a person must prove that he has been persecuted (or fears persecution) on one or more of the grounds listed in 8 U.S.C. § 1101(a)(42)(A). One of these grounds is "membership in a social group." The Board of Immigration Appeals has defined a "social group" as "a group of persons all of whom share a common, immutable characteristic." *In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985); see *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005); *Lwin v. INS*, 144 F.3d 505, 511-12 (7th Cir. 1998). An immutable characteristic, as defined by the Board, need not be an innate characteristic like race or sex (setting aside the possibility of sex-change operations); it just has to be something that can't be changed (or is so fundamental, equivalent to a person's religion, that he shouldn't be forced to change it, but that is not an issue here); and thus it includes a "shared past experience," *In re Acosta*, *supra*, 19 I. & N. Dec. at 233, since the past cannot be changed. James C. Hathaway, *The Law of Refugee Status* 161 (1991).

The word "social" is obviously not intended to confine the category to bridge clubs and the like, but rather to distinguish groups whose members are targets of persecution because of their group membership from racial, religious,

and other groups that are separately designated in the asylum statute. Thus, among the groups that have been recognized as qualifying under the standard of the *Acosta* case are the educated, landowning class of cattle farmers targeted by Colombian rebels, *Tapiero de Orejuela v. Gonzales, supra*, 423 F.3d at 672; Christian women in Iran who oppose the Islamic dress code for women, *Yadegar-Sargis v. INS*, 297 F.3d 596, 603 (7th Cir. 2002); parents of Burmese student dissidents, *Lwin v. INS, supra*, 144 F.3d at 512; and children who escaped after being enslaved from Ugandan guerillas who had enslaved them, *Lukwago v. Ashcroft*, 329 F.3d 157, 171, 172 (3d Cir. 2003); but not Iranians who refused *as individuals* to serve in the Revolutionary Guards and instead left Iran to study in the United States, *Najafi v. INS*, 104 F.3d 943, 947 (7th Cir. 1997). Unsurprisingly—since only denials of asylum, not grants, are judicially reviewable—all but *Lwin* are cases in which the Board of Immigration Appeals thought that the petitioner was *not* a member of a social group. (In *Lwin* the immigration judge and the Board overlooked the issue.) The courts granted the petitions believing that the Board had departed from the rule it had laid down in *Acosta*. Obviously administrative agencies can change their minds. But they are required to give reasons for doing so. *Rust v. Sullivan*, 500 U.S. 173, 186-87 (1991); *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 42 (1983); *Davila-Bardales v. INS*, 27 F.3d 1, 5 (1st Cir. 1994). In the cases we've cited—as in this case—the Board had failed to explain how their rejection of the claimed social group squared with the test the Board had adopted in *Acosta*.

The cases help to clarify a definition ("shared past experience") that the Board has never taken literally. Everyone shares the experience of having been born, but no one would think that all human beings (plus all living

things produced by parturition rather than by mitosis) constitute a single social group for purposes of asylum law. A social group has to have sufficient homogeneity to be a plausible target for persecution. But under *Acosta* this is not a demanding requirement, and is easily satisfied by a group of former employees of a particular institution. See, e.g., *Cruz-Navarro v. INS*, 232 F.3d 1024, 1028-29 (9th Cir. 2000); *In re Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988).

The immigration judge missed this point because he misunderstood Sepulveda's claim. He said that Sepulveda "has failed to demonstrate that this particular identifying characteristic (his employment with the Attorney General's Office) is immutable. To the contrary, by his own admission, he resigned from the Attorney General's Office after arriving in the United States." The social group to which Sepulveda belongs consists of former, not present, employees of the Attorney General's Office. From *that* group he cannot resign.

The judge did say that Sepulveda does not have a reasonable fear of being persecuted if he returns to Colombia, but he did not explain this conclusion. We do not know whether former members of the Office who have the kind of information that Sepulveda is carrying around in his head would be targets of the insurgents. They might be, because it is information that the insurgents would very much like to have. Nor do we know how large the Office is and therefore the significance of the fact that in a five-year period 136 of its employees were murdered or kidnapped; those moreover were current employees of the Office; we do not know how many former employees, if any, have been victimized. As we said in *Ahmed v. Ashcroft*, 348 F.3d 611, 619 (7th Cir. 2003), a claim for asylum such as Sepulveda's "must also be examined to determine whether the danger flows from an ongoing violent struggle affecting the population in a

relatively undifferentiated way or if danger exists on account of a protected ground; only the latter will suffice under the statute. [The petitioner] failed to offer objective support for his more speculative assertions. Moreover, the evidence did not compel the BIA to find that former members of the security and police forces in Algeria are targeted in a manner that is distinct from the risks borne by other segments of Algerian society." Nor do we know whether the government is unwilling or incapable of protecting persons in Sepulveda's position from insurgents.

These are matters for exploration in further proceedings before the immigration judge. The petition for review is granted and the order of the Board of Immigration Appeals vacated.

A true Copy:

     Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
