In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 05-4444

VOLODYMYR PAVLYK, NATALIA PAVLYK,
and IRYNA PAVLYK,

*Petitioners*,

*v.*

ALBERTO R. GONZALES,

*Respondent.*

_____

Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A 95 924 674, A 93 415 976, & A 95 924 704

_____

ARGUED SEPTEMBER 8, 2006—DECIDED DECEMBER 4, 2006
AMENDED DECEMBER 7, 2006[Œ]

_____

Before EASTERBROOK, *Chief Judge*, and CUDAHY and
MANION, *Circuit Judges*.

MANION, *Circuit Judge.*  Volodymyr Pavlyk, a former
Ukrainian prosecutor, along with his wife and daughter,
seek review of the final decision of the Board of Immi-
gration Appeals that denied them asylum, withholding
of removal, and relief under the Convention Against
Torture. Because of the untimeliness of their applica-
tions, we lack jurisdiction over their asylum claims and
dismiss their petition for review. Additionally, we deny

_____

[Œ] The opinion is hereby amended to include the inadvertently
omitted concurrence by Judge Cudahy.

the petition for review on the remaining claims because Pavlyk has not demonstrated persecution on account of membership in a social group or political opinion. Nor has he shown a sufficient likelihood of torture.

## I.

Volodymyr Pavlyk is a citizen of Ukraine. After serving in the Soviet Army he married Natalia Lashkiv, who gave birth to their one daughter, Iryna. Pavlyk meanwhile studied law in Ukraine, graduating with honors in 1992. Following graduation, he became a criminal investigator and then a prosecutor in Lvivskaya, a region in Ukraine. As a prosecutor, Pavlyk investigated and prosecuted murders, rapes, and other serious criminal matters. Pavlyk seeks asylum and other relief for himself, and for his wife and daughter derivatively, based on alleged persecution he experienced in the course of his work as a prosecutor. We recount the incidents as Pavlyk describes them.

The alleged persecution arose from Pavlyk's investigation into the 1996 murder of a leader in an organized criminal group named Foyder. Pavlyk suspected that a local businessman, Stetsyk Igor Ivanovich, participated in the murder, perhaps having hired it. In the course of the investigation, Pavlyk learned that Stetsyk had engaged in money laundering and had served as an undercover informant for the Soviet KGB. Pavlyk also recovered a rifle during a search of Stetsyk's apartment.[1] Believing that

---

[1] At the hearing before the Immigration Judge, Pavlyk stated that he recovered a rifle "used when Mr. Foyder was murdered," but in a translated written statement submitted in the

(continued...)

Stetsyk was involved in the murder, Pavlyk detained Stetsyk, but higher officials arranged for Stetsyk's release and cautioned Pavlyk not to proceed further with the case. At about the same time, Pavlyk pursued another controversial investigation into the beating and torture of two detained men by police officers. His superiors, however, removed him from that case.

Following his interaction with Stetsyk, Pavlyk began to receive threats against himself and his family. Stetsyk accused Pavlyk of soliciting a bribe, causing the prosecutor's office to scrutinize Pavlyk's work. Stetsyk also confronted Pavlyk outside the prosecution's office building, threatening his wife and daughter. Pavlyk also noticed strangers watching him, and discovered that strangers had even visited his daughter's school, where they asked the teacher to identify Pavlyk's daughter. The various threats and accusations against Pavlyk culminated with shots being fired at his car as he left the prosecutor's building one evening. Ultimately, Pavlyk resigned from his position as prosecutor.

While these events transpired, Pavlyk's wife was in the United States on a non-immigrant visitor visa attending a conference. Because of the threats, Pavlyk advised his wife to stay in the United States and arranged for his daughter to reside with her grandparents in Ukraine. Pavlyk then went into hiding. Ukraine subsequently charged Pavlyk with accepting a bribe and a warrant for Pavlyk's arrest remains outstanding there. After a year of

(...continued)
course of seeking asylum, Pavlyk wrote that "a rifle was found but not the murder weapon." The Immigration Judge did not address this discrepancy.

hiding, Pavlyk obtained a passport and visa under the alias Nikolai Naryjkin, which he used to enter the United States on April 27, 1998. Pavlyk reunited with his wife. Two years later, on February 11, 2000, their daughter Iryna joined them, entering the United States on a non-immigrant visitor visa. The family then resided in Chicago, where they worked, paid taxes, and Iryna attended school.

Ukraine continued to pursue its charges against Pavlyk. By letter, a Ukrainian official requested assistance from the Department of Justice in investigating and apprehending Pavlyk. The record, however, does not indicate that Ukraine ever requested that the United States extradite Pavlyk. The United States subsequently detained Pavlyk for overstaying his visa and on June 11, 2003, notified him that he was subject to removal. He then petitioned for asylum, withholding of removal, and relief under the Convention Against Torture. His wife and daughter similarly sought asylum derivatively from Pavlyk's claims. Pavlyk was released on bond for the duration of the proceedings.

At a hearing on April 29, 2004, the Immigration Judge ("IJ") denied the Pavlyks' applications for asylum, requests for withholding of removal, and relief under the Convention Against Torture. While the IJ noted that the applications were untimely, he also addressed their merits. Curiously, the IJ doubted whether Pavlyk actually served as a prosecutor, but concluded that even if Pavlyk's testimony were credible, he had failed to demonstrate persecution that was because of his political opinion or membership in a social group. The Board of Immigration Appeals adopted and affirmed the IJ's decision, with additional reasoning. Pavlyk, along with his wife and daughter, petition this court to review the denial of asylum,

withholding of removal, and relief under the Convention Against Torture.

## II.

We first address the timeliness of the asylum applications. An alien may apply for asylum if "the application has been filed within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). It is undisputed that Pavlyk and his wife and daughter did not file an application within one year of their entry into the United States. The statute, however, provides for two exceptions to this time limit: "if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the" one-year time limit. 8 U.S.C. § 1158(a)(2)(D). If an application is deemed untimely under the one-year limit or the exceptions under 8 U.S.C. § 1158(a)(2), then the statute provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2) [of 8 U.S.C. § 1158(a)]." 8 U.S.C. § 1158(a)(3). We have previously held that this statutory language "is sufficiently specific to show that Congress intended to preclude judicial review of agency action under § 1158(a)(2)." *Zaidi v. Ashcroft*, 377 F.3d 678, 681 (7th Cir. 2004) (citations omitted). Therefore, if an IJ makes a determination of untimeliness, we lack jurisdiction to review the decision.

Although Pavlyk does not dispute the untimeliness of his application, he does contest whether the IJ made a determination of untimeliness that would preclude our

jurisdiction. Specifically, Pavlyk claims that he did not seek asylum due to fear for his daughter's safety while she remained in Ukraine, and due to continued fear even after her arrival in the United States. He submits that his fear was an extraordinary circumstance warranting the delay and that the IJ never explicitly addressed this contention. The IJ's oral decision, however, states:

> Finally [I] come to the one year bar. . . . I do not agree that [Pavlyk] has established either a material change in country conditions so compelling as to justify that delay or that there were extraordinary circumstances which excused the timely filing of his application. However, I have independently analyzed this claim assuming [for] the sake of discussion that he had established some justification for [t]he delay.

Pavlyk argues that this statement does not constitute a holding of untimeliness, but rather "assumed an exception" since the IJ proceeded to the merits of the asylum claim. The IJ's statement, however, tracked the language of the two exceptions, disagreed with Pavlyk regarding their fulfillment, and constituted an alternative basis for denying asylum. Furthermore, the Board stated in its affirmance that "[w]e agree with the Immigration Judge, in so far as he found the respondents' application for asylum untimely." If the Board "adopts the IJ's decision while supplementing the decision with its own reasoning, the IJ's decision, as supplemented by the BIA's decision, becomes the basis for review." *Gjerazi v. Gonzales*, 435 F.3d 800, 807 (7th Cir. 2006) (citation omitted). Thus, the agency has made a determination that the petitions were untimely. Consequently, we lack jurisdiction to review the timeliness of the asylum applications or their underlying merits. *See also Vasile v. Gonzales*, 417 F.3d 766,

768 (7th Cir. 2005) ("[T]his jurisdictional bar, even as qualified by the REAL ID Act [which confers jurisdiction to review constitutional claims or questions of law], prevents us from reviewing the BIA's factual determination.").

Despite the untimeliness of the asylum application, Pavlyk remained "eligible to request withholding of removal." *Zaidi*, 377 F.3d at 681 (citing 8 C.F.R. § 208.3(b); *Niam v. Ashcroft*, 354 F.3d 652, 654 (7th Cir. 2004)). An alien may not be removed "if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). We review a decision denying "withholding of removal under the highly deferential substantial evidence standard." *Mabasa v. Gonzales*, 455 F.3d 740, 745 (7th Cir. 2006) (citation omitted). In order "to reverse the IJ's decision, [Pavlyk] must show that 'the evidence not only *supports* that conclusion, but *compels* it.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)); *see also* 8 U.S.C. § 1252(b)(4)(B).

To qualify for withholding of removal, an alien bears the burden of proof and "must demonstrate a 'clear probability' that he or she will face persecution in the country to which he or she will be removed." *Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005) (citation omitted). The alien must show that if he were removed to the country in question he would "more likely than not" face persecution based on one of the specified grounds, "a more stringent test than the standard for establishing eligibility for asylum." *Id.* (citation omitted). We therefore examine the two grounds under which Pavlyk requests relief: whether Pavlyk would more likely than not face persecution "because of" his membership in a particular social group or his political opinion.

We first address Pavlyk's claim based on membership in a social group. To make a claim on this basis, Pavlyk must "1) identify a particular social group; 2) establish that [ ]he is a member of that group; and, 3) establish that h[is] well-founded fear of persecution is based on h[is] membership in that group." *Yadegar-Sargis v. INS*, 297 F.3d 596, 603 (7th Cir. 2002) (internal quotation and citation omitted). We have held that "a characteristic that defines a 'social group' within the meaning of the immigration laws 'must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.'" *Orejuela v. Gonzales*, 423 F.3d 666, 672 (7th Cir. 2005) (quoting *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (quoting *In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985))). Pavlyk asserts that he is a member of a "particular group of Ukrainian prosecutors." More specifically, Pavlyk classifies himself within a subset of uncorrupt prosecutors who were subjected to persecution for exposing government corruption. Pavlyk identifies only one other member of this amorphous group, Vitaly Petlyuk, who was convicted of bribery and sentenced to four years of imprisonment in deplorable conditions. Regardless of the precise contours of the group, being a prosecutor is not an unchangeable or fundamental attribute. Pavlyk, in fact, resigned from his position and has subsequently worked as a carpenter and a painter in this country. It is Pavlyk's particular conduct as a prosecutor and not his status as a member of such a purported social group that caused the alleged persecution.

Pavlyk further presses his social group claim by citing *Aguilera-Cota v. INS*, 914 F.2d 1375, 1380 n.3 (9th Cir. 1990), for the proposition that government employees may

constitute a social group. In *Aguilera-Cota*, the alien worked for the Central Board of Elections in El Salvador. Although "politically neutral," he began to receive threats based on his work for the government. *Id.* at 1378. *Aguilera-Cota*, however, merely suggested in dicta that "a strong case" for asylum could be made based on a social group theory, but held instead that asylum was warranted based on political opinion because the persecutors, "armed political rebels," had imputed a political opinion to the government employee for assisting with an election and persecuted him on that basis. *Id.*

   Potentially more relevant for Pavlyk is a recent decision in this circuit, in which we noted that "former employees of a particular institution" could constitute a social group from which an individual obviously "cannot resign." *Sepulveda v. Gonzalez*, 464 F.3d 770, 772 (7th Cir. 2006) (citing *inter alia In re Fuentes*, 19 I. & N. Dec. 658, 662 (BIA 1988)). In *Sepulveda*, the alien was a former member of the Colombian Attorney General's Office who possessed information about confidential investigators, including their aliases, and about protected witnesses. *Id.* at 771. From that office, 136 active employees had been murdered or kidnaped during a five-year period. *Id.* We granted review and directed the IJ to consider whether Sepulveda's knowledge would make him a target of the insurgents on account of his social group since "we don't know how many former employees, if any, have been victimized." *Id.* at 772. Pavlyk does not demonstrate that he possessed special knowledge or a particular vulnerability intrinsic to his alleged social group. Critically, however, Pavlyk did not define his social group as that of *former* prosecutors, thereby removing this case from the ambit of *Sepulveda* and *Fuentes*.

Regardless, even assuming that the various threats and actions against Pavlyk constituted persecution and that the prosecutors constituted a social group, Pavlyk cannot demonstrate that the persecution was "because of" his membership in a social group. 8 U.S.C. § 1231(b)(3)(A). Rather, Pavlyk's story chronicles individualized threats arising from two investigations. At most, this suggests that any persecution stemmed from his conduct in those particular investigations and not because of his status as a member of a group of prosecutors. *See In re C-A-*, 23 I. & N. Dec. 951, 957 (BIA 2006) (noting that "if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, without more, to have been targeted as a member of a particular social group."). As the Board stated in this case, "[w]e do not believe that [Pavlyk] produced evidence from which it is reasonable to conclude that the harm threatened was motivated, even in part, by an actual or imputed protected ground." The Board's determination that the persecution was not caused by a protected ground is a factual determination. *See Musabelliu v. Gonzales*, 442 F.3d 991, 996 (7th Cir. 2006). The evidence does not compel a result different from the IJ's or the Board's determination that there was no persecution on account of a social group and, accordingly, Pavlyk is not entitled to withholding of removal on this basis. *Mabasa*, 455 F.3d at 745.

Pavlyk more aptly claims that he is entitled to with-holding of removal because of threats based on his political opinion. We have stated that "[a] political opinion is one that is expressed through political activities or through some sort of speech in the political arena." *Li v. Gonzales*,

416 F.3d 681, 685 (7th Cir. 2005) (citations omitted). For example, "[s]omeone who campaigns against the government and urges the voters to throw the rascals out is engaged in political speech," as is "someone who writes an op-ed piece or otherwise urges the people to rid themselves of corrupt officials." *Musabelliu*, 442 F.3d at 995. Pavlyk did not engage in any of these classic political activities.

This does not end our analysis, however, because this court has acknowledged that "[w]histle-blowing about public corruption can be a form of political opinion." *Id.* (citations omitted). Pavlyk argues that he was a whistle-blower who tried to expose government corruption and faced persecution as a consequence of his efforts. His claim falls short because in his investigation into corruption he "did not take [his evidence of corruption] to the public in quest of a political decision." *Id.* at 996 (citations omitted). Instead, Pavlyk pursued an investigation within his role as a prosecutor. *See id.* (noting that the alien "made his views known within the chain of command, as part of his official duties," which was insufficient to constitute an expression of political opinion).

Furthermore, we previously noted that "[i]t is an open question even in the United States whether the first amendment gives public officials a right to be free of retaliation when they speak within an agency's hierarchy on an issue of public concern, as part of their duties." *Id.* (noting that the Supreme Court had granted certiorari in *Garcetti v. Ceballos*, 125 S. Ct. 1395 (2005), to address this issue). Subsequently, the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does

not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006). This holding reinforces the characterization of Pavlyk's conduct within his employment as a prosecutor as non-political speech; it would be implausible to offer broader protection for speech to an alien under the immigration laws than is provided to citizens under the First Amendment.

Even assuming that Pavlyk suffered persecution, his actions within his position as a prosecutor that brought about the alleged persecution do not constitute expressions of political opinion. Even further assuming that Pavlyk expressed a political opinion, the Board's factual determination that Pavlyk did not suffer persecution because of his political opinion is supported by substantial evidence. Since Pavlyk does not demonstrate that his "life or freedom would be threatened in that country because of . . . political opinion," he is not entitled to withholding of removal. 8 U.S.C. § 1231(b)(3)(A). Furthermore, because his wife's and daughter's claims are derivative of his own, they also do not qualify for withholding of removal.

Pavlyk next claims that he is entitled to withholding of removal under the Convention Against Torture ("CAT"). We again review the denial of relief under the substantial evidence standard, analyzing whether "the record compels a contrary result." *Mabasa*, 455 F.3d at 744 (internal quotation and citations omitted). Relief under the CAT does not have to be on account of membership in a social group or political opinion to qualify for relief. Instead, to obtain relief under CAT, Pavlyk must show that "it is more likely than not that if removed to Ukraine, he will be subject to torture." *Boyanivskyy v. Gonzales*, 450 F.3d 286, 292 n.3 (7th Cir. 2006). The regulations define torture as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1). Notably, however, the regulations exclude lawful sanctions from the definition of torture: "[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions . . . includ[ing] judicially imposed sanctions and other enforcement actions authorized by law." *Id.* at § 208.18(a)(3). There is a further exception to the exception, which states that lawful "sanctions that defeat the object and purpose of the [CAT] to prohibit torture" may be considered torture. *Id.*

Both the IJ and the Board concluded that Pavlyk did not meet his burden of proof to show a sufficient likelihood of torture upon his return to Ukraine. Pavlyk makes two arguments with respect to his likelihood of torture. He first cites death threats against him and his family, as well as the incident of shooting at him while in his vehicle. With respect to this argument, we note that there is insufficient evidence to conclude that the threats and shootings were "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 208.18(a)(1).

Pavlyk was threatened by Stetsyk, who was not a public official or acting in an official capacity, and Pavlyk could not identify the shooters, although he speculated that the police "organized" the shooting.

Pavlyk next argues that he will be subjected to torture if he returns to Ukraine because he may be convicted of bribery and sentenced to two to fifteen years in prison. According to the State Department Report for 2004, prison conditions have "improved somewhat," but remain "sometimes overcrowded or lacked adequate sanitation and medical facilities." There have been "reports that police regularly beat detainees and prisoners." It is not, however, assured that Pavlyk would be convicted if returned to Ukraine. The allegations of bribery recounted in the letter from a Ukrainian official seem to arise, at least in part, from money transfers from Mariya Zasypko in the United States to Pavlyk in Ukraine. At the hearing before the immigration judge, however, Zasypko testified that she sent the money to Pavlyk to pay for the construction of a house in Ukraine, that Pavlyk acted as a courier of the money to the builder, and that the house was in fact built. Furthermore, even if convicted, the pain and suffering caused by the prison conditions would fall within the exception to torture for lawful sanctions. 8 C.F.R. § 208.18(a)(3). Pavlyk's arguments do not "compel a contrary result" from the IJ's and the Board's decisions. *Mabasa*, 455 F.3d at 744. Since Pavlyk fails to demonstrate that "it is more likely than not that if removed to Ukraine, he will be subject to torture," he is not entitled to relief under the CAT. *Boyanivskyy*, 450 F.3d at 292 n.3.

We must also address Pavlyk's contention that the government waived its arguments regarding the untimeliness of Pavlyk's petition and regarding relief under the

CAT by not briefing those arguments before the Board. The government, however, never intentionally relinquished or abandoned a known right, as is required for waiver. *United States v. Thigpen*, 456 F.3d 766, 769 (7th Cir. 2006) (citation omitted). Instead, the government in its two-page brief to the Board "concur[red] with [the] findings by the Immigration Judge" and requested affirmance. As discussed above, the IJ did make findings regarding the timeliness and the CAT. We find no basis for waiver. This argument is without merit.

Finally, Pavlyk requests that we remand the case to the IJ to consider new evidence presented on appeal based on alleged ineffective assistance of counsel in the proceedings before the IJ. The Board denied the motion to remand, a decision that we review for abuse of discretion. *Boykov v. Ashcroft*, 383 F.3d 526, 529-30 (7th Cir. 2004) (citation omitted). "Under this standard, the Board's decision will be upheld unless it was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Id.* at 530 (internal quotation and citation omitted). The Board concluded that Pavlyk did not demonstrate prejudice from his counsel's alleged ineffectiveness, and therefore denied the motion to remand. Since this is an appropriate reason for denial, the Board did not abuse its discretion, and Pavlyk is not entitled to a remand.

## III.

Because the agency determined that Pavlyk's petition is untimely, we lack jurisdiction to review the asylum claims. Furthermore, because Pavlyk is not entitled to withhold-

ing of removal to Ukraine because he has not demonstrated that his life or freedom would be threatened based on his political opinion or his membership in a social group, and because he has not demonstrated a likelihood of torture, we deny the petition for review.

CUDAHY, *Circuit Judge,* concurring. I join the majority opinion in all respects save its importation (in dicta) into the Immigration and Nationality Act of concepts having their basis in the First Amendment jurisprudence applicable to public employees. Thus, the majority cites dicta in *Musabelliu v. Gonzales,* 442 F.3d 991 (7th Cir. 2006), for the proposition that political opinions expressed in the course of an alien's official duties are not to be considered in connection with persecution and hence eligibility for asylum or withholding of removal under the Act. *See* Majority Op. at 11-12, *citing Musabelliu,* 442 F.3d at 996. The *Musabelliu* court noted that it was an "open question" whether the First Amendment protects public employees in the United States when they speak as part of their duties—a question since closed in part by *Garcetti v. Ceballos,* 126 S. Ct. 1951 (2006)—and found it "implausible" to grant asylum to aliens persecuted for speech "near the outer limit of the first amendment's coverage." *Musabelliu,* 442 F.3d at 966 (citing to and discussing *Garcetti,* then awaiting decision by the Supreme Court).

It seems to me that this importation of our First Amendment's "extra-employment" condition for protection of

speech into the Immigration and Naturalization Act's conditions for asylum and withholding of removal ignores the plain language of the Act's relevant provisions, which require only that "the alien's life or freedom would be threatened . . . because of the alien's . . . political opinion," 8 U.S.C. § 1231(b)(3)(A) (withholding of removal), or that the alien face "persecution or a well-founded fear of persecution on account of . . . political opinion," 8 U.S.C. § 1101(a)(42)(A); *see also id.* § 1158(b)(1)(A); 8 C.F.R. § 208.13(b)(1) (asylum). This language does not require any *expression* of opinion, only the *holding* of one, and it certainly does not exclude from the Attorney General's consideration any specific type of expression, such as speech pursuant to a public employee's official duties.

Besides these plain statutory requirements, the concerns shaping the First Amendment rights of public employees are unlike the policies underlying asylum and withholding of removal. The First Amendment attempts to balance the societal value of a government employee's speech on matters of public concern against the government's interest in controlling the conduct of its employees. *Garcetti*, 126 S. Ct. at 1960. The Immigration and Nationalization Act's asylum provisions, by contrast, are designed to protect aliens against not just any sanction, but *persecution* on account of their political opinions, a sanction more severe than any public employee is likely to face in the United States. *See, e.g., Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003) (upholding a Board determination that detaining a person for three days without food and beating him until his face swelled was not severe enough to constitute persecution). The Act is not motivated by a desire to fine-tune the balance between informed public

debate and the efficient provision of public services in foreign nations, but by the belief that severe persecution on account of a political opinion is wrong and that those unfortunate enough to be subjected to it should be sheltered. Given the difference in goal, it is not surprising that the statute should protect some individuals who express their political opinions in ways that would not be protected by the First Amendment if performed in the United States. Even within our borders, a "powerful network of legislative enactments" extends the Constitution's minimum protection of politically charged speech. *Garcetti*, 126 S. Ct. at 1962. The Immigration Act's political asylum provisions similarly extend that protection.

It is true that, in general, asylum applicants who have not expressed their political opinions in classically political activities, such as public political campaigns or newspaper articles, may find it more difficult as a practical evidentiary matter to prove that any persecution directed at them was motivated by their political opinions. *See* Majority Op. at 11, *citing Musabelliu*, 442 F.3d at 995; *see also Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997). But in some situations, an applicant's conduct of her public duties may carry an obvious political implication that invites persecution. *See, e.g.*, *Bace v. Ashcroft*, 352 F.3d 1133, 1137-38 (7th Cir. 2003) (holding that persecution of an election commissioner for failure to certify an election was on account of a political opinion); *Chouchkov v. INS*, 220 F.3d 1077, 1084 (9th Cir. 2000) (holding that persecution of a Russian atomic energy agency employee for objecting within the agency to the agency's sale of materials to Iran was on account of a political opinion); *Reyes-Guerrero v. INS*, 192 F.3d 1241, 1245 (9th Cir. 1999) (holding that persecution of a public prosecutor for investigating

corruption by members of a rival political party was on account of a political opinion).

For these reasons, as to Pavlyk's political opinion claim, I would rely only on the Board's factual determination that Pavlyk was not threatened because of his political opinion—a finding that is supported by substantial evidence.

A true Copy:

      Teste:

                               _____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*