NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 23, 2007
Decided March 2, 2007

**Before**

Hon. JOEL M. FLAUM, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 06-2028

| | |
|---|---|
| SOFIANE DJELLOULI, *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals |
| *v.* | No. A77-656-296 |
| ALBERTO R. GONZALES, Attorney General of the United States, *Respondent*. | |

## O R D E R

Sofiane Djellouli, an Algerian citizen, petitions for review of an order denying him withholding of removal. Djellouli claims that he was threatened by unidentified "terrorists" because he provided medical care to members of the Algerian military and police. An Immigration Judge decided that the treatment Djellouli suffered did not rise to the level of persecution, and that the risk he would be harmed if sent home was too remote to compel withholding of removal. Because this conclusion is supported by substantial evidence, we deny the petition.

## Background

In May 2000, Djellouli came to the United States on a visitor's visa at the invitation of his sister and overstayed. By his own account, he was not initially planning to seek asylum. However, he changed his mind after he was placed in removal proceedings by the INS in early 2003 for overstaying his visa. At this point, more than two and a half years after he first arrived in the United States, Djellouli applied for asylum, withholding, and relief under the Convention Against Torture (CAT).

Djellouli claimed that he would be harmed by an unnamed terrorist group on account of his political opinion and membership in a particular social group if he returned to Algeria. Specifically, he said at his asylum hearing that a terrorist group he described as the "Djehad" targeted him because, as a dental assistant at a clinic located near a police station, he frequently provided medical treatment to the members of the Algerian military and police. According to Djellouli's testimony, he heard gunshots one morning in November 1998 as he was leaving his house and got out of his car to investigate. Neighbors told him that "terrorists" were "around" and were going into his house. Djellouli was frightened and left the neighborhood, moving in with his sister who lived in another town. He did not actually see the terrorists who entered his home, but he was told afterwards by his mother—who was home at the time—that the terrorists asked her about his and his brother's whereabouts. Djellouli asserted in his asylum application that the terrorists were after his brother because his brother worked as a security guard at a university. He also said that terrorists burned his car. Djellouli's brother was killed about six weeks after the shooting incident. Djellouli contended that terrorists were responsible but that conclusion was based entirely on the prior events.

Djellouli's brother-in-law and sister (a different sister from the one with whom he stayed in Algeria) also testified in person. The brother-in-law testified that a group called "Islamic Jihad" had killed Djellouli's brother, burned his car, burned the clinic where he worked, and would kill Djellouli if he returned. However, the brother-in-law has lived in the United States since 1994, so it appears that his knowledge was based entirely on information he received second-hand from family members in Algeria. He also admitted that conditions in Algeria have improved at least in the large cities. Although the sister, who came to the United States a few months after Djellouli, confirmed that terrorists (she was unable to name the specific group) had threatened Djellouli and killed his brother, the details of her testimony differed from the testimony of both Djellouli and the brother-in-law. She said that Djellouli was threatened, not because he provided medical care to the authorities, but because he refused to provide medical care to the terrorists. Her testimony about the fate of Djellouli's clinic also differed from the account given by the brother-in-law. She suggested that, rather than being intentionally burned, it was accidentally bombed when terrorists targeted the nearby police station.

The IJ concluded that Djellouli was barred from seeking asylum because he failed to file within one year of his entry into the United States and had not shown that exceptional circumstances excused the delay. With respect to Djellouli's withholding claim, the IJ reasoned that Djellouli had not experienced persecution because the mistreatment he alleged consisted of a single unfulfilled threat, which as a general rule would not be sufficient to constitute persecution. The IJ acknowledged Djellouli's testimony that his brother was later killed by terrorists, but he concluded that this "extremely weak and vague testimony does not show that the death of the respondent's brother is any way a result of the respondent's actions." The IJ also noted that Djellouli was "extremely vague" about who threatened him and why. Finally, the IJ decided that Djellouli's claim was undermined by the fact that he remained in Algeria for almost a year and a half without suffering any more threats or violence from terrorists, that his mother and sister still lived there and had never been harmed, and that terrorist attacks had decreased since he had left Algeria. The BIA affirmed the IJ's decision without adding any significant analysis.

**Analysis**

Djellouli concedes that this court lacks jurisdiction to consider the denial of his asylum claim because he filed it more than a year after he entered the United States. *See* 8 U.S.C. §§ 1158(a)(2)(B), (a)(3). He also has waived any argument about his CAT claim by failing to address that claim in his brief. *See Balliu v. Gonzales*, 467 F.3d 609, 614 (7th Cir. 2006). Therefore our review is limited to the decision denying him withholding. The standard for withholding is more stringent than that for asylum and required Djellouli to show that his life or freedom would be threatened if he returned to Algeria. *See* 8 U.S.C. § 1231(b)(3)(A); *Firmansjah v. Gonzales*, 424 F.3d 598, 604-05 (7th Cir. 2005). To demonstrate this he had to establish that it was more likely than not that he would face persecution on account of one of the grounds specified in the asylum statute. *See* 8 C.F.R. § 1208.16(b)(2); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1087 (7th Cir. 2006). If he showed that he was persecuted in the past, he was entitled to a presumption that his life or freedom would be threatened in the future. *See* 8 C.F.R. § 1208.16(b)(1)(i). We review a denial of withholding for substantial evidence and will reverse only if the evidence compels a different conclusion. *Pavlyk*, 469 F.3d at 1087.

Although there are some problems with the IJ's decision, the record does not compel a different result. The only harm that Djellouli personally suffered was the threat made by the alleged terrorists who visited his house. We have frequently upheld findings by immigration courts that unfulfilled threats did not qualify as persecution. *See, e.g., Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006); *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997). As we have explained, threats will constitute persecution "only in the most extreme circumstances, such as where they

are of a most immediate or menacing nature or if the perpetrators attempt to follow through on the threat." *See Bejko*, 468 F.3d at 486. In this instance Djellouli provided few details about the alleged threat. Although he submitted a police report stating that he was threatened with assassination, he did not elaborate on this event in his testimony. He admitted that he had no personal contact with the terrorists, and his account of what they told his mother was quite limited; he said only that they asked after his whereabouts, not that they threatened to kill or otherwise harm him. It is not clear that this inquiry even qualifies as a threat, much less an immediate and menacing threat.

Djellouli argues, however, that the terrorists did fulfill their threat because they killed his brother. The IJ discounted this evidence because Djellouli had not shown that his brother's death was "in any way a result of [his] actions." Though this statement is ambiguous, the IJ presumably meant that there was not enough evidence to connect the brother's death with the earlier inquiry about both brothers. This conclusion is supported by substantial evidence. Although Djellouli, his brother-in-law, and his sister all testified that the same terrorists who came to Djellouli's house killed the brother, none of them witnessed the killing or explained how they knew who killed his brother. It is not even clear that the killing of Djellouli's brother was an intentional act. Djellouli submitted a police report recounting that his brother was killed by terrorists, but the report does not say whether the brother was targeted or merely a victim of random violence. Although the IJ could have done a better job of explaining his decision to discount this event, given the lack of detail about either the initial threat or the killing, the record does not compel a different conclusion. *See Ahmed v. Ashcroft*, 348 F.3d 611, 613, 618–19 (7th Cir. 2003) (former Algerian police officer's vague testimony about death threats to his brother did not compel finding that he had well-founded fear of persecution); *Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999) (vague evidence that petitioner was threatened many years ago does not compel finding that he had well-founded fear of persecution).

Djellouli next argues that, even if he did not show that he suffered past persecution, he still showed that it is more likely than not that he would be persecuted in the future. Specifically, he faults the IJ for finding that he lived in Algeria for over a year after his brother's death without suffering further harm; Djellouli insists that the IJ ignored his sister's testimony that he remained in hiding and rarely left his other sister's house during this time. Although the IJ perhaps should have given this testimony some consideration, his decision was based on more than the absence of harm to Djellouli while he lived with his sister. The IJ also pointed out that terrorist violence in Algeria had decreased since the late 1990s when Djellouli was threatened. The country reports that Djellouli submitted support this conclusion as does the most recent report of which this court may take judicial notice, *see Giday v. Gonzales*, 434 F.3d 543, 556 n.6 (7th Cir. 2006). For example, the 2002 and 2003 reports that Djellouli submitted reflect that

according to press reports violent deaths decreased significantly from 1,386 people in 2002 to 1,162 people in 2003 (a number that includes terrorists and security force personnel as well as civilians). The 2002 number itself represented a decrease from 2001. The most recent report reflects that, according to government numbers, only 488 people (and only 76 civilians) died in 2005. U.S. Department of State, *Report on Human Rights Practices: Algeria* 1 (2005). The report also states that terrorist violence occurred primarily in rural and mountainous areas, *id.* at 2, and the 2002 and 2003 reports state that the security forces had "largely forced the terrorists out of the cities." Furthermore, since 1999 the Algerian government has twice offered amnesty to members of armed groups who agree to lay down their weapons, and this has led to a considerable decrease in violence by Islamic militants. BBC News, *Country Profile: Algeria* 1-2 (2006); BBC News, *Algeria Amnesty Deadline Expiring* 1 (2006).

Finally, the IJ found that Djellouli's mother and sister continued to live in Algeria without being harmed. The fact that a petitioner's family has not been harmed undermines a claim that the petitioner faces a risk of future harm. *Toptchev v. INS*, 295 F.3d 714, 722 (7th Cir. 2002); *Sayaxing v. INS*, 179 F.3d 515, 522 (7th Cir. 1999). Djellouli says that the terrorists had no reason to target his family, but if the terrorists really wanted to find Djellouli they might have continued to harass his family to discover his whereabouts as they did when they first went to his house.

For the above reasons, we DENY the petition.