**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0174n.06

**No. 08-4601**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Mar 19, 2010**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| VICTOR PENDRAK, aka Viktor Pendrak, | ) | |
| | ) | ON REVIEW FROM THE |
| | ) | BOARD OF IMMIGRATION |
| Petitioner, | ) | APPEALS |
| | ) | |
| v. | ) | |
| | ) | **O P I N I O N** |
| ERIC H. HOLDER, JR., Attorney General, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |

_____

**Before:  COLE, GILMAN, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Petitioner Viktor Pendrak[1] seeks review of a Board

of Immigration Appeals (BIA) order affirming without opinion the Immigration Judge's (IJ's)

decision denying his claims for asylum and withholding of removal pursuant to the Immigration and

Nationality Act, and for relief pursuant to the United Nations Convention Against Torture (CAT).

We **DENY** Pendrak's petition for review.

_____

[1]Pendrak's first name is inconsistently spelled in the official documents relating to these proceedings.  In this opinion we will use the spelling favored by the petitioner himself.

# I. BACKGROUND

## A.    Pendrak's Account

Pendrak is a native and citizen of Ukraine.  Pendrak's wife at the time of the hearing was a Ukranian citizen who resided in Ukraine with their two daughters.[2]  (A.R. 78.)  In 1988, when Pendrak was eighteen, he was drafted into the Ukrainian army and served two years.  (A.R. 74.)  After serving in the army, he worked as an electrician and as a salesman, and, in 1996, opened an automotive body shop.  (A.R. 76, 151.)  During the time Pendrak owned and operated his body shop, he angered the Ukrainian mafia because he refused to acquiesce to their demands for money.  Pendrak testified that, when he owned the body shop, the mafia threatened him and his family, stole his car, and ultimately burned down the body shop. (A.R. 80.)  In July 1998 Pendrak moved from Ukraine to Greece where he worked in construction for a little over a year.  (A.R. 73, 92.)  Pendrak testified that, after he returned from Greece, the Ukrainian mafia beat him in order to claim their money.  Pendrak stated he was kicked "all over [his] body" but could not successfully report the incident to the police because they were connected to the mafia and would not pay attention to him. (A.R. 80.)

In February 2000, Pendrak voluntarily joined the Ukranian army as a sergeant, signing a contract to serve for three years.  (A.R. 76, 93.)  Pendrak left the army without permission after three months.  (A.R. 76.)  When asked why he left the army, Pendrak replied, "Because they were

---

[2]All documents in the administrative record indicate that Pendrak is married to Ukrainian citizen Anjelika Bobak.  They divorced in 2000 because Pendrak feared she would be harassed because of her association with him; however, they were remarried a few months later.  (A.R. 34, 140.)  At his April 2007 hearing, Pendrak stated he was still in communication with Bobak.  (A.R. 78.)  However Pendrak's brief on appeal states that, on December 17, 2008, he married a United States citizen, Maria Popovich, with whom he currently resides.  Popovich has apparently filed an I-130 Petition for Alien Relative on behalf of Pendrak.  Pendrak has also filed an Application for Adjustment of Status.  (Pet. Br. 8.)

suppose[d] to send me into places where I did not want to go." (A.R. 76.) When asked where he would be sent, Pendrak said, "They would not tell me the truth, but I guess it was Chechnya." (A.R. 77.)[3] Pendrak went to Moscow, where he stayed for several months. He obtained a fraudulent visa (he testified that he did not know it was fake) and left for the United States in February 2001. (A.R. 86.)

Pendrak wrote in his asylum application that he "know[s] the penalty for desertion is a long prison sentence" and that "if I returned I would be put in prison and most probably tortured while in prison for deserting the Ukranian National Army. The punishment is very severe for deserters, they are beaten, and tortured and are kept in prisons for years. Some deserters do not manage to survive this brutal treatment." (A.R. 152.) He also stated that prisoners are not given medical treatment and that no one can stop the poor treatment of prisoners because "it is part of the institution and can be inflicted totally at will." (A.R. 153.) At his removal hearing, Pendrak expressed his belief that "there is a contract in any army that [it] will try to torture you or kill you when you leave it."[4] (A.R. 84.) He also stated to the IJ, "If you want to save my life I would like to ask you not to send me back home because there is no law in the Ukraine and they will get me there." (A.R. 88.)

While residing in Moscow, Pendrak had returned to Ukraine briefly to visit his family. At that time, he feared he would be served with a court martial for deserting the army. Although he did not receive one, he said "they were sending a letter [stating] that I have to appear." (A.R. 84.)

---

[3]In his asylum application, Pendrak wrote that "I was told that I would be tran[s]ferred to the war zone (which is Chechnya) to do guard duties there. I did not want to go because I see no point in this war in Chechnya, so I deserted." (A.R. 153.) The official who conducted Pendrak's credible-fear interview stated that Pendrak "abandoned his post after learning that he would be guarding a factory near Chechnya, because he did not want to be in danger." (A.R. 136.)

[4]The government pointed out that under the terms of the contract, Pendrak was allowed to terminate the contract "on the grounds of family circumstances or any other significant reasons as provided by regulations of administration of Ukraine." (A.R. 83, 93.)

**B.**     **Immigration Proceedings**

In February 2001, Pendrak entered the United States using a fake visa. (A.R. 65.) He was served with a Notice to Appear on April 24, 2001, charging him with removability under 1) Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (INA) (8 U.S.C. § 1182(a)(7)(A)(i)(I)), as an immigrant who, at the time of admission, did not possess a valid entry document, and 2) Section 212(a)(6)(C)(i) of the INA (8 U.S.C. § 1182(a)(6)(C)(i)), as an alien who fraudulently or willfully misrepresented a material fact when he procured documentation for admission into the United States. (A.R. 322-23.) An IJ found Pendrak removable, and Pendrak thereafter filed an application for asylum, withholding of removal, and protection under the CAT.

Although Pendrak had filed his application with the assistance of counsel, he attended his April 13, 2007 merits hearing *pro se*. After the hearing, the IJ issued an oral decision denying Pendrak's application and ordering him removed to Ukraine. (A.R. 32-41.) The IJ found Pendrak credible. However, the IJ concluded that Pendrak's fears were "subjective," and that "there is no evidence . . . based upon an objective standard that [Pendrak] would be given severe punishment that would amount to persecution under the Act or violation of [the] torture convention." (A.R. 38.) The IJ noted that the Ukranian mafia engaged in similar bullying activities against other businesses, and that Pendrak was not specifically targeted. The IJ found that such general harsh conditions had no relation to any particular status of Pendrak's, and, thus, did not amount to persecution under the Act. (A.R. 39.) The IJ found that Pendrak had deserted the army after three months because he no longer wished to serve.[5] The IJ found that the Ukranian government has the right to require Pendrak to

---

[5]The IJ's exact finding is somewhat unclear from the transcript: Pendrak "remained in the army for three months because he did not want to go to or remain in the army for any other reason. . ." (A.R. 38.) It may be that the key word "Chechnya" was omitted, making the actual statement, Pendrak "remained in the army for three months because he did not want to go to *Chechnya* or remain in the army for any other reason . . ." Accordingly, a fair reading of the IJ's conclusion is that

meet his contractual obligations, and that any court martial to which Pendrak might be subject would be "prosecution and not persecution." (A.R. 39-40.) The IJ noted that it had taken into account the most recent State Department report for Ukraine and concluded that there was no evidence that Pendrak's punishment would be disproportionately severe. (A.R. 37, 40.) Finally the IJ rejected Pendrak's CAT claim, finding that Pendrak had not met the more-likely-than-not standard, and in fact that Pendrak had presented "no credible evidence that he would suffer torture at the hands of the Ukranian Government if he were returned to the Ukraine." (A.R. 40.)

Again represented by counsel, Pendrak appealed to the BIA, which affirmed the IJ's decision without opinion on September 24, 2008. (A.R. 10.) Pendrak timely sought review in this court and filed a motion for stay of removal pending appeal. The motion was granted on March 6, 2009.

## II. ANALYSIS

### A. Legal Standards

Because the BIA affirmed the IJ's decision without an opinion we review the IJ's decision directly. *Denko v. INS*, 351 F.3d 717, 730 (6th Cir. 2003) ("we evaluate the IJ's explanation as that of the Board"). In general, the IJ's legal conclusions are reviewed *de novo*, *Ramirez-Canales v. Mukasey*, 517 F.3d 904, 907 (6th Cir. 2008), and factual findings are reviewed for substantial evidence, *Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005). Under the substantial evidence standard, factual findings are treated as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* The IJ's findings receive significant deference; a reviewing court cannot reverse "simply because it is convinced that it would have decided the case differently." *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004).

---

Pendrak did not want to go to Chechnya and/or Pendrak simply did not want to serve anymore. In any event, it is clear that the IJ found that Pendrak deserted the army for reasons that did not justify his leaving.

Under the INA, asylum can be granted to an alien who qualifies as a "refugee," defined as someone "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [his or her home country] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant is required to show three things to demonstrate a well-founded fear of future persecution:

> (1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear.

*Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004)). To show a "reasonable possibility" of persecution, the applicant need not prove persecution by a preponderance of the evidence. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987) ("One can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place.").

Eligibility for withholding of removal is based on the same grounds that form the basis of an asylum claim—fear of persecution based on race, religion, nationality, membership in a particular social group, or political opinion. *See Singh v. Ashcroft*, 398 F.3d at 401. Although the decision to grant asylum is a matter of the Attorney General's discretion, if a petitioner meets the requirements, withholding of removal is mandatory. *Id.* However, in order to qualify for withholding of removal, the petitioner must meet a higher standard—a "clear probability," or more likely than not, that he would be subject to persecution in the proposed country of removal. *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006); *See* 8 U.S.C. § 1231(b)(3).

In order to establish a CAT claim, an applicant must show that it is more likely than not that the applicant would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). A petitioner need not show that the torture is based on one of the five protected grounds. *See Almuhtaseb*, 453 F.3d at 751. Torture is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 1208.18(a)(2). "Specifically, it is 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted' to extract information, punish, intimidate, coerce, or otherwise discriminate, 'when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.'" *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 1208.18(a)(1)). Significantly, "lawful sanctions" that do not defeat the object and purpose of the CAT are excluded from the definition of torture. *See Pavlyk v. Gonzales*, 469 F.3d 1082, 1090 (7th Cir. 2006) ("[t]orture does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions . . . includ[ing] judicially imposed sanctions and other enforcement actions authorized by law") (quoting § 208.18(a)(3)).

**B.     Analysis**

As a preliminary matter, because Pendrak did not pursue his claims concerning the Ukranian mafia before the BIA or in his briefing in this court, we will not address them. *See Kalaj v. Gonzales*, 137 F. App'x 851, 852 n.2 (6th Cir. 2005) (unpublished) (petitioner briefing only asylum issue waived non-argued claims).

Turning to the desertion issue, the IJ's conclusion that Pendrak did not face persecution under the Act is supported by substantial evidence. Though Pendrak argues for the first time on appeal that

he was a conscientious objector to the war in Chechnya, and that he deserted on that basis,[6] there is nothing in the record to indicate that Pendrak's decision to desert was based on his political views or membership in an otherwise protected group. *Contra Vujisic v. INS*, 224 F.3d 578, 581-82 (7th Cir. 2000) (petitioner singled out for persecution over other deserters because of his Slovenian background and the perception that he would spy for Slovenia). Because Pendrak has failed to show that any future persecution would be on the basis of one of the five protected grounds, his asylum claim fails. *See Singh*, 398 F.3d at 401. Pendrak's withholding of removal claim has the same requirement, *see id.*, so that claim fails on the same basis.

Turning to Pendrak's torture claim, we have repeatedly recognized that the punishment that a deserter or a draft dodger faces does not ordinarily meet even the less stringent "persecution" standard. *See Pascual v. Mukasey*, 514 F.3d 483, 487 (6th Cir. 2007) ("[I]t is hardly unusual, much less a form of persecution, for governments to conscript their citizens into military service, then to punish those who do not fulfill their duty. Such conduct does not by itself ordinarily rise to the level of persecution on the basis of political opinion."); *Vuljaj v. INS*, 77 F. App'x 793, 798 (6th Cir. 2003) (unpublished) (detention for evading military service not persecution because governments have right to require military service and penalize noncompliance); *Elias v. INS*, 108 F.3d 1376 at *3 (6th Cir. 1997) (unpublished) ("[I]t is well-settled that punishment for failure to comply with a country's compulsory military service is prosecution, not persecution.") (quotation marks omitted); *see also Gojcevic v. Gonzales*, 142 F. App'x 257, 261 (6th Cir. 2005) (unpublished) ("[R]efusal to perform military service in one's native country is not ordinarily a valid basis for establishing asylum

---

[6] "[I]n some cases, refusal to enter the army may render one a refugee if[,] for instance, the reason for refusal is a genuine political, religious or moral conviction or to valid reasons of conscience." *Gojcevic v. Gonzales*, 142 F. App'x 257, 261 (6th Cir. 2005) (unpublished) (internal quotation marks omitted).

eligibility.") (quotation marks omitted).  The persecution standard may be met in those "rare cases where a disproportionately severe punishment would result."  *See Elias* at 108 F.3d at *2.  But it is significantly more difficult to show that it is more likely than not that the petitioner will be tortured. *See, e.g., Pavlyk*, 469 F.3d at 1090-91 (torture standard not met where petitioner faced potential conviction and imprisonment in overcrowded facilities that lacked adequate sanitation where police reportedly regularly beat prisoners).

Although Pendrak submitted additional materials on appeal, the administrative record contains only the State Department's country reports for Ukraine, and we are limited to reviewing the administrative record.  *See Gishta v. Gonzales*, 404 F.3d 972, 979 (6th Cir. 2005) (refusing to consider extra-record information).  The most recent report in the record, which the IJ said he reviewed, was the 2006 report, which stated that prison conditions in Ukraine were poor, but slowly improving as a result of reform.  (A.R. 98.)  The report details several individual instances of harsh treatment – including prisoners being searched, beaten, and their food destroyed – and notes that conditions in pretrial detention centers were harsher than in low and medium security prisons.  (A.R. 98.)  Tuberculosis infection is a concern, as is overcrowding.  (A.R. 98.)  Although the government allowed prison visits by human rights observers, observers sometimes had difficulty getting full access.  According to the 2006 country report for Ukraine, prisoners were permitted to file complaints with a human rights ombudsman about conditions, but sometimes were punished for doing so.  (A.R. 99.)  The 2006 report did reveal significant improvement in the prison system since 2001, though.[7]

---

[7]The 2001 report started off the relevant section by simply stating:  "[P]olice and prison officials regularly tortured and beat detainees and prisoners, and there were numerous reports of such abuse."  (A.R. 159.)

Even in light of the evidence of poor conditions in Ukranian prisons, we cannot say that any reasonable adjudicator would be compelled to find it more likely than not that Pendrak will be tortured. Pendrak testified that he had not received a court martial before leaving Ukraine, and the record is silent as to his current status. Uncertainty as to whether a petitioner will face punishment upon return is a factor to be considered. *See Pavlyk*, 469 F.3d at 1090-91 (poor conditions in Ukrainian prisons do not entitle petitioner to CAT relief where, among other things, "[i]t is not . . . assured that [petitioner] would be convicted if returned to Ukraine").

Even assuming that, as Pendrak claims, he likely faces a court martial and prison time, this does not entitled him to CAT relief. In *Pavlyk*, the Seventh Circuit evaluated whether the conditions in Ukranian prisons, including overcrowding, lack of adequate sanitation and medical facilities, and reports of police beatings, amounted to torture. *See* 469 F.3d at 1090. The court concluded that the "pain and suffering" caused by such conditions would fall within 8 CFR § 208.18(a)(3)'s lawful-sanction exception to torture where the petitioner faced a bribery conviction carrying two to fifteen years in prison. *Id*. at 1090-91. The *Pavlyk* court was evaluating the Ukranian system under the 2004 State Department report. The conditions in our record (as described two years later) are similar. Under these circumstances, we cannot say that the harsh conditions that Ukranian prisoners potentially face amount to a more-likely-than-not chance that Pendrak will experience severe pain or suffering that is intentionally inflicted to punish, coerce, or otherwise discriminate, by or with the consent of a public official. *See Haider*, 595 F.3d at 289.

### III.  CONCLUSION

We cannot conclude that any reasonable adjudicator would be compelled to find contrary to the IJ's determination.  Accordingly, we **DENY** Pendrak's petition for review of the BIA's decision.