# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-3872

REXHEP BEJKO,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A76-785-860.

ARGUED MAY 12, 2006—DECIDED NOVEMBER 13, 2006

Before MANION, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Petitioner Rexhep Bejko is a native and citizen of Albania, who was detained while attempting to enter the United States unlawfully, and sought asylum and withholding of removal pursuant to §§ 208(a) and 241(b)(3) of the Immigration and Nationality Act, and protection under Article 3 of the United Nations Convention Against Torture. The Immigration Judge (IJ) denied him relief on all of those claims, and the Board of Immigration Appeals (BIA) affirmed. He now appeals that determination to this court.

Bejko alleges that he suffered past persecution, and that he has a well-founded fear of future persecution, in Albania

based on his membership in the Democratic Party in Albania. At the hearing before the IJ, Bejko testified as to a series of events in Albania that form the basis for his asylum claim. He testified that he became a member of the Democratic Party from its inception, and that he served on the Board of Elections in Albania. On September 12, 1998, Azim Hadjari, a member of parliament for the Democratic Party, was killed by six gunmen outside Democratic Party headquarters. Upon his death, chaos ensued in Tirana, Albania, where Bejko lived. Hadjari's funeral occurred two days later in Tirana. Bejko attended the funeral, but not the procession following it, and he acknowledged that general chaos was present throughout Albania on the day of the funeral. While at his home that evening, Bejko heard noises such as gunshots in his backyard. He saw three masked men in military uniform in his backyard. The following morning, he discovered that his van had been stolen. Bejko reported the incident to the police, and was informed that based on his description of their clothing, the perpetrators were probably state policemen assigned to the investigation of crimes. Bejko filed a report with the police, but stated that no action was taken against the perpetrators.

On October 16, 1998, Bejko was summoned to the police station to meet with an investigator. That investigator accused him of participating in illegal demonstrations and meetings for the Democratic Party. The investigator sought information regarding the organizers of those meetings and demonstrations, which Bejko did not provide. At the end of the meeting, he was assessed a fine, but was permitted to return home to obtain the funds to pay it. Although he intended to return the next day to pay the fine, the police came to his home before he was able to do so, and returned him to the Tirana police station where he was again accused of participating in illegal meetings and demonstrations of the Democratic Party. When he again refused to

inform as to the organizers, he was placed in a small cell. He was held there for two weeks under primitive conditions. He was provided an inadequate amount of food, which included only lunch and dinner, and lost a significant amount of weight during that time. He also was provided minimal water, and was allowed to use the bathroom only once a day. He was released on October 30, and walked the three or four kilometers from the jail to his home. He did not need medical treatment as a result of his confinement.

Bejko continued to work on behalf of the Democratic Party following that confinement. On November 22, 1998, a referendum was to be held in Albania on a proposed constitution. Bejko was a representative of the Democratic Party to the Election Board, which involved him in supervising the election and establishing the accuracy of the voter registration list in an area near his home. He was part of a three-member team that also included a member of the Socialist Party and a member of the Balli Kombetar Party, whose function was to travel house to house to verify the voter registration list. During that process, the team discovered discrepancies on the list, such as a deceased person and two persons who had left Albania still on the list. Bejko and the Balli Kombetar representative asserted that those individuals needed to be removed from the list, but that suggestion was met with much resistance from the representative of the Socialist Party. On November 16, 1998, Gazmend Demi arrived at Bejko's house, and told Bejko's wife that unless Bejko resigned from the election commission, his home would be blown up. Bejko and his family feared Demi, because he had a reputation as a person who had committed crimes including murder, and he ostensibly was protected by the Socialist Party. Bejko resigned the next day, and five days later Bejko and his wife departed for the United States.

Because the BIA summarily affirmed the IJ's order, we base our review on the IJ's analysis. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004). In order to succeed on his

claim for asylum, Bejko must demonstrate that he is unable or unwilling to return to his country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A); *Hanaj v. Gonzales*, 446 F.3d 694, 698 (7th Cir. 2006). If he has demonstrated past persecution, he is entitled to a rebuttable presumption of a well-founded fear of future persecution. *Id.* We review the IJ's adverse determination under a highly deferential standard, reversing only if no reasonable fact finder could fail to find that the petitioner suffered from past or future persecution. *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006); *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004). It is irrelevant whether or not this court would have reached the same conclusion if in the IJ's position. Only where the evidence compels a different result may we reverse. *Id.*

That standard of review ultimately ordains the outcome of this appeal. As the IJ recognized, Bejko based his persecution claim on the following events: (1) the theft of his van and the gunshots fired in the vicinity of his yard on September 15; (2) the questioning at the police station on October 16, resulting in the imposition of a fine; (3) the return to the police station on October 17, culminating in his confinement for a two-week period; and (4) the November 16 visit by Demi and the threat to his home and family. The IJ was not required, however, to find that those incidents constituted past persecution or the well-founded fear of future persecution.

The events must be considered as a whole to provide the context, as the IJ recognized in her thorough decision, but the most serious allegations are undoubtedly the confinement and the threat to his home. In *Diallo v. Ashcroft*, 381 F.3d 687, 698 (7th Cir. 2004), we reviewed the caselaw in this circuit and recognized that "short detentions or detentions without physical abuse seem to have been less

apt to reach the 'persecution' threshold required by this court." Determination of whether a detention constitutes persecution includes consideration of the circumstances as a whole, including the length, frequency and conditions of the confinement, and the severity of the treatment such as whether there was physical or other abuse. Thus, in *Asani v. INS*, 154 F.3d 719, 721 (7th Cir. 1998), we held that it was likely that detentions were sufficiently serious to rise above the level of mere harassment where the applicant was detained for two weeks in a cell with only enough room to stand, handcuffed to a radiator on the wall, and received only one slice of bread and one glass of water a day, with that detention resulting in the loss of his construction job, and he was later detained again and beaten with fists and a police stick, during which two teeth were knocked out. On the other hand, in *Dandan v. Ashcroft*, 339 F.3d 567, 573-74 (7th Cir. 2003), we held that the IJ was not compelled to find persecution where the applicant was detained for three days without food, interrogated and beaten resulting in a swollen face. The two week detention in this case certainly was not insignificant, and we do not minimize the painfulness of the experience, but it was not accompanied by physical abuse, and was not of a duration or frequency that would compel a finding of past persecution. Although he experienced some deprivations during his confinement, he was provided with at least the minimal level of food and water, and did not require any treatment upon his release—in fact acknowledging that he was able to walk 3 to 4 kilometers to his home at that time. Again, the question before us is not whether such a confinement can constitute past persecution, and we do not hold here that the described confinement and threats are insufficient to constitute past persecution as a matter of law. Instead, the only question before this court is whether the IJ was compelled to find that such confinement constituted past persecution. As we noted in *Dandan*, that is "a high standard and one that is properly difficult to meet without powerful and moving

evidence." *Id.* In light of the caselaw in this circuit holding that confinement of such a nature is often not sufficient to constitute past persecution, the IJ was not compelled to find past persecution on these facts.

Of course, we do not view the confinement in isolation from the other allegations; it is axiomatic that the evidence of persecution must be considered as a whole, rather than piecemeal. *Cecaj v. Gonzales*, 440 F.3d 897, 899 (7th Cir. 2006). But the other allegations do not elevate the circumstances to the level of past persecution as a matter of law. There is no allegation that the theft of the van was tied to his political views, and the questioning at the police station was a relatively benign occurrence. The threat by Demi, on the other hand, is more serious in nature. Threats can constitute past persecution only in the most extreme circumstances, such as where they are of a most immediate or menacing nature or if the perpetrators attempt to follow through on the threat. *Boykov v. INS*, 109 F.3d 413, 416 (7th Cir. 1997); *Roman v. INS*, 233 F.3d 1027, 1035 (7th Cir. 2000). In the majority of cases, however, threats in and of themselves will not compel a finding of past persecution. *Boykov*, 109 F.3d at 416; *Ahmed v. Ashcroft*, 348 F.3d 611, 616 (7th Cir. 2003). "Rather, unfulfilled threats will fall within that category of past experience more properly viewed as indicative of the danger of future persecution." *Boykov*, 109 F.3d at 416.. We have also recognized, however, that "[a] credible threat that causes a person to abandon lawful political or religious associations or beliefs is persecution." *Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006). In this case, Bejko did not point to any actions taken by Demi to follow through with the threat. Rather, the reputation of Demi was the critical factor that caused the Bejkos to give the threat credence, and to fear that it would be carried out. The IJ noted, however, that Bejko failed to provide any corroborative evidence as to Demi's reputation, such as statements from his friends or family, including his

brother who resided in the United States. The IJ could have been more detailed in her consideration of the threat as an aspect of past persecution, but in his briefs to this court, Bejko discusses the threat only in a cursory manner in his past persecution analysis, and has not developed any argument that the threat was of an immediate or menacing nature, or that it otherwise compelled a finding of past persecution under the caselaw of this circuit. Accordingly, Bejko has failed to demonstrate that the IJ was compelled to find past persecution.

Bejko additionally challenges the IJ's determination that there was no well-founded fear of future persecution. As support for that argument, Bejko relies at length on portions of State Department reports. The government pointed to those reports as well to demonstrate that the country conditions had changed since Bejko's departure. The IJ determined that those reports refuted any threat of future persecution to Bejko based on his involvement in the Democratic Party. The United States Department of State 2003 Country Report on Human Rights Practices stated that recent elections throughout the country were generally calm, and represented an improvement over previous elections, with only a few isolated incidents of irregularities. Furthermore, the United States Department of State 2004 Profile of Asylum Claims and Country Conditions noted the consensus that in recent years Albanians had been able to freely exercise their right to change their government through democratic means including the ability to organize and campaign free from government interference. The Profile further noted that any fear of the secret police had diminished as a result of its restructuring, increased level of professionalism, and lack of involvement in political activity. Finally, the Profile recognized that serious political repression existed in the past, but noted that there had been no major outbreaks of political violence since 1998, and that "the available

evidences suggests that neither the Government nor the major political parties engage in policies of abuse or coercion against their political opponents."

Bejko does not contend that those reports are inaccurate, but instead argues that the IJ failed to consider other portions of the reports favorable to his position. The portions cited to this court by Bejko, however, do not undermine the IJ's conclusion. Bejko cites to the provisions detailing the conditions of prisons, and treatment of prisoners in general, but that is not relevant unless the imprisonment resulted from political activity. The Country Report, however, which discusses the treatment of prisoners, also states that there were no confirmed cases of detainees being held for strictly political reasons. Bejko's reliance on general human rights issues such as societal violence, discrimination against women and children, and treatment of prisoners and the media does not indicate that he has a well-founded fear of persecution based on his political activities. Instead, the reports relied on by the IJ indicate that after the violence and political turmoil experienced in 1997 and 1998, the political process became much more stable. The electoral process had resulted in coalition government, with participation by both the Democratic Party and the Socialist Party, among others. *See also Cecaj v. Gonzales*, 440 F.3d 897, 900 (7th Cir. 2006)(noting that conditions in Albania have changed even further, with the Democratic Party gaining control of the government in 2005). The IJ properly focused on the report as it related to the claim before her. The prior threat was based on actions by Bejko as a member of the Democratic Party and as a participant on the electoral committee in a prior election, and subsequent elections have taken place in a fairer environment. There was no testimony that any adverse actions have been taken against him or his family since the threat was issued, and the house that Demi had threatened to blow up apparently remained untouched after

Bejko fled, and in fact was later sold by his brother-in-law. Bejko had testified that he remained in contact with friends who told him that Demi still was seeking out Bejko, but the IJ noted that he provided no letters or other corroboration from those friends as to whether Demi was still alive, whether he was still interested in Bejko, and whether he was still associated with the Socialist Party. Given the changed political climate, the absence of any evidence that Demi presented any continuing threat, and the tie of the threat to the actions surrounding a distant election, the IJ was not compelled to find a well-founded fear of persecution.

The remaining issue is whether the IJ committed reversible error in failing to inform Bejko of his right to request withdrawal of his application for admission. Bejko asserts that the failure to inform him of that right pursuant to 8 C.F.R. § 1240.11(a)(2) and 8 U.S.C. § 1225(a)(4) violated his due process rights. The government argues that Bejko failed to demonstrate prejudice resulting from the alleged failure, and we agree.

Bejko's due process claim based on the IJ's failure to inform is reversible error only if he can demonstrate prejudice arising from it, and he has failed to do so. *Ramos v. Gonzales*, 414 F.3d 800, 804 (7th Cir. 2005); *Feto v. Gonzales*, 433 F.3d 907, 912 (7th Cir. 2006). Bejko was represented by counsel in the proceedings before the IJ, and does not allege that he was actually unaware of that right to withdraw his application for admission. Moreover, his only allegation of prejudice before this court is that had he been so informed, he "may have focused his endeavors on obtaining it." He thus does not argue that his actions below would have been different in any way, nor does he assert that he was in fact unaware of that right. Because he has not alleged any prejudice that resulted from the IJ's alleged failure to inform him of his rights, this claim must fail.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*