# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-2644 & 08-3777

SUGANTHAN PATHMAKANTHAN,

*Plaintiff-Appellee*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Defendant-Appellant.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A099 031 921

ARGUED MARCH 29, 2010—DECIDED JULY 16, 2010

Before CUDAHY and KANNE, *Circuit Judges*, and
DARRAH, *District Judge*.[*]

CUDAHY, *Circuit Judge.* As fighting raged between Sri
Lankan security forces and the separatist Tamil Tigers,
Suganthan Pathmakanthan (Petitioner) found himself
caught in the middle. Petitioner is an ethnic Tamil who

---

[*] Honorable John W. Darrah, United States District Judge for
the Northern District of Illinois, is sitting by designation.

lived in an area of Sri Lanka controlled by the Tigers. Although he was not personally involved with the Tigers, he was subject to repeated stops and questioning by the Sri Lankan forces. Between 2002 and 2005, he was subjected to some 15 arrests, after which he was detained, questioned and promptly released each time. At one point, Petitioner traveled to India and returned to Sri Lanka without fleeing or seeking asylum. Sometime after that return, though, he was arrested and threatened with death. He was released without harm after 10 hours. Petitioner subsequently fled Sri Lanka and, using false Indian identification, boarded a plane that arrived at Chicago's O'Hare Airport on August 24, 2007.

Petitioner applied for asylum, withholding of removal and relief under the United Nations Convention Against Torture (CAT). After all three were denied by the Immigration Judge (IJ) and the Board of Immigration Appeals (BIA), he moved to reopen based on changed circumstances in Sri Lanka (namely the reported breakdown of the cease-fire between Sri Lankan security forces and the Tamil rebels). The motion to reopen was denied. Pathmakanthan now petitions for review of these decisions.

Notwithstanding the many difficult experiences that he endured, Petitioner has not shown that he had been the subject of persecution. Further, despite the poor human-rights conditions in Sri Lanka, Petitioner has not shown that he faces a well-founded fear of future persecution. Moreover, the BIA did not abuse its discretion in denying his motion to reopen. For these reasons, and

the ones that follow, we deny the consolidated petition for review.

## I.  BACKGROUND

Petitioner is an ethnic Tamil from the Northern Province of Sri Lanka who is in his late 20s. Since he was a child, his homeland has been the scene of an often-brutal armed conflict between the Sri Lankan govern-ment and the Liberation Tigers of the Tamil Eelam (LTTE), a rebel group that regularly committed atrocities, which resulted in its being designated a terrorist organization by the U.S. State Department.

As a young, ethnic Tamil male, Petitioner was the subject of attention, stops and questioning by the Sri Lankan forces. In 1997, Petitioner and his parents were detained at a refugee camp for four months and were released only after his uncle posted a bond. Between 2002 and 2005, he was arrested and detained during round-ups of Tamils in his area over 15 times. In each of these inci-dents, the police both questioned him and presented him to masked informants in order to determine whether he was a Tiger militant or supporter. Each time they released him after a short detention. He was never beaten or physically injured.

In 2005, when Petitioner began working for the German NGO, Sewalanka, as a monitoring officer overseeing 50 villages, he traveled extensively in the Tamil-controlled region. He was stopped by security forces daily and detained for up to two hours while he assured them that

he was not a supporter or member of the LTTE. In the course of his duties with the NGO, Petitioner traveled to India for training. India admitted him based on a group visa and Sri Lanka readmitted him based on his own identification. While in India, Petitioner did not seek or formally inquire about asylum. In August 2006, Petitioner quit the NGO due to harassment and threats from the authorities and personal fears for his safety. He began working for his father's construction business.

In 2007, the Sri Lankan criminal-investigation department arrested Petitioner, took him into custody and brought him to a camp. There they interrogated him again about his ties to the LTTE and threatened to kill him. Petitioner stated that he believes he was not killed at the time because his family knew of his arrest and pleaded for his release.

In August 2007, Petitioner obtained false Indian documentation and fled Sri Lanka via Malaysia and Japan, arriving at Chicago's O'Hare Airport.

Under the Immigration and Nationality Act (INA), the Department of Homeland Security (DHS) charged Petitioner with removal based on his inadmissibility under Section 212(a)(6)(C)(i) (entering the United States through fraud or misrepresentation of material fact) and Section 212(a)(7)(A)(i)(I) (an immigrant not in possession of a valid visa). 8 U.S.C. § 1182. Initially Petitioner conceded to his removability on both charges, but was later allowed to withdraw his concession of the fraud charge. Petitioner immediately requested withholding of removal pursuant to Section 241(b)(3) of the INA, asylum in the

United States pursuant to Section 208 of the INA and relief under the CAT. *See* 8 U.S.C. § 1227; 8 U.S.C. § 1158; 8 C.F.R. §§ 1208.16 *et seq.*

On January 17, 2008, the IJ issued a decision denying Petitioner's asylum request on the merits. Petitioner timely appealed to the BIA, which adopted and affirmed the IJ decision on June 5, 2008. Pathmakanthan petitions this court for review of that order. Docket No. 08-2644. On September 26, 2008, Petitioner filed a motion with the BIA, requesting that the Board reopen the earlier matter due to a change in country conditions. On October 23, 2008, the BIA denied this request, citing the Petitioner's failure either to file within 90 days of the prior decision or to provide sufficient evidence that the circumstances had changed in Sri Lanka. *See* 8 C.F.R. § 1003.2(c)(3)(ii). Pathmakanthan also petitions for review of the BIA's refusal to reopen the matter. Docket No. 08-3777. We have consolidated both matters.

## II. DISCUSSION

Under 8 U.S.C. § 1158, the Attorney General or Secretary of Homeland Security may grant asylum to aliens who qualify as refugees as defined in 8 U.S.C. § 1101(42)(A). In order to qualify as a refugee, an alien needs to demonstrate two things. First, he must show that he has been the victim of past persecution or has a well-founded fear of future persecution. § 1101(42)(A). Second, he must show that the persecution is on account of race, religion, nationality, membership in a particular social group or

political opinion. *Id.* Under the CAT, an alien may be withheld from removal if she establishes that it is more likely than not that she would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(2). The CAT standard is more stringent than the one for asylum. *See Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004).

We treat the BIA's adoption of the IJ decision as a final agency decision, and we reverse only if the evidence compels a reasonable fact finder to another conclusion. *Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002); *Pop v. INS*, 270 F.3d 527, 529 (7th Cir. 2001). Where, as here, the BIA merely supplements the IJ's opinion, that opinion, as supplemented by the Board, forms the basis for review. *See Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). In conducting our review, we will "inquire only whether the Board's decision has the support of 'reasonable, substantial, and probative evidence on the record considered as a whole.'" *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). We review the BIA's denial of the motion to reopen for abuse of discretion. *INS v. Abudu*, 485 U.S. 94, 107 (1988). We review matters of law, including claims of denial of due process, de novo. *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 482 (7th Cir. 2007).

A. *Substantial Evidence Supports the IJ's Determination That Petitioner Did Not Suffer Past Persecution*

Petitioner's life story is compelling. Police and military forces have detained him, interrogated him and even

once threatened him with death while he was merely trying to go about his business. He tells of his family's going into hiding and giving up their business after a threat, and of his entire family's being detained for months in a refugee camp, only to be released when his uncle posted a bond.[1]

A determinative definition of "persecution" has proven elusive. There is no statutory definition; nor has the BIA provided one. *See, e.g.*, *Chen v. Gonzales*, 457 F.3d 670, 674 (7th Cir. 2006). However, we have characterized persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Boci v. Gonzales*, 473 F.3d 762, 766 (7th Cir. 2007) (quoting *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003)). Persecution includes threats to life or freedom as well as other violence or abuse, yet it need not necessarily be life-threatening. *See Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005); *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1990). But "[p]ersecution involves harms that go beyond mere harassment; it results from more than simply 'unpleasant or even dangerous conditions in [the applicant's] home country.'" *Ahmed v. Gonzales*, 467 F.3d 669, 673 (7th Cir. 2006) (quoting *Nakibuka v. Gonzales*, 421 F.3d 473, 476 (7th Cir. 2005)).

Petitioner certainly suffered harassment when the police rounded him up with others some 15 times in 3 years and subjected him to interrogation and detention. Each time, and quite understandably, he worried that

---

[1] We note that the IJ deemed Petitioner's testimony credible.

the masked informant whose job it was to identify Tiger rebels would mistakenly mark him for punishment or worse. When he was employed by the NGO, Petitioner was stopped almost daily at checkpoints and questioned. These stops sometimes lasted up to two hours and were undoubtedly intimidating and harassing. Since we cannot know the full details of Pathmakanthan's experiences in Sri Lanka, his own behavior can be informative. It is important that Petitioner left the country for India during this time. His return to Sri Lanka from India is telling. Had Petitioner truly been in fear for his life, or otherwise experienced persecution at the hands of the Sri Lankan government, the prospect of returning home would surely have been far from attractive. That he chose not to seek asylum in India suggests that he not been subject to persecution at that time. His being subject to repeated stops and detentions was surely anxiety-inducing and harassing. But it does not in itself amount to past persecution.

We must consider the matter of the death threat made against Petitioner during the Criminal Investigation Department (CID) detention, which occurred after Petitioner's return from India. In May 2007, Pathmakanthan was riding his motorbike when the CID stopped him, arrested him and took him to a detention facility. The CID held him at the camp for ten hours during which it threatened his life. Petitioner's detention was witnessed by his family's neighbors, and later that evening he was released when his parents came to the camp and demanded his release. Petitioner asserts that the public nature of his arrest was the only reason he was threatened

rather than actually killed at the camp. He contends that, had his parents not arrived and insisted on his release, the CID may have taken his life. Twelve years earlier, Petitioner's brother died, and while the government maintained that he was killed by a land mine, Petitioner believed that it was at the hands of the government. Once threatened, he feared a similar fate for himself. After his release from the camp, Petitioner hid for three months. In response to an apparently unrelated threat to Petitioner's father, his father had to close his construction business and his family had to pay a bribe to a pro-government group.

Threats alone, and particularly threats of death, can amount to persecution under certain circumstances. In *Mitev*, we considered the possibility that living under threat of death by secret government forces might rise to this level. *Mitev*, 67 F.3d at 1331. To live, day after day, knowing that government forces might secretly arrest and execute you is itself a form of mental anguish that can constitute persecution. Yet, logic dictates that for an unfulfilled threat to rise to the level of persecution, it must be something extraordinarily ominous. It cannot simply be a threat of death that, in context, is just a matter of words. In *Mitev*, while we noted the potential for threat-based persecution by the secret police, we denied the petitioner's appeal because his threats came from co-workers unhappy with his political activism, not the government itself. *Id.* at 1328-29. Even threats from police did not amount to past persecution when they were not acted on and, in context, were viewed as less than likely to be fulfilled. *Boykov v. INS*, 109 F.3d 413, 416

(7th Cir. 1997). "In the vast majority of cases . . . mere threats will not, in and of themselves, compel a finding of past persecution." *Id.*

Petitioner has not presented evidence that he suffered past persecution due to the threat alone. We note that he took the threat seriously, both because he says that he did (and the IJ found him credible) and because he went into hiding for three months after it. Yet, if the government wanted to kill Petitioner, it seems unlikely that it would have released him later that evening at the insistence of his parents. Petitioner contends that the CID did not execute him in the camp because there were witnesses to his arrest. We cannot know the inner workings of the Sri Lankan CID or whether it would truly be motivated to spare a life under these circumstances, yet it seems logical that, even if the presence of a witness thwarted the killing, the CID would not release someone they wanted dead. One would expect that the police would hold such a person pending some sort of charge or investigation. In saying this, we do not say that the threat against Petitioner was not serious, frightening or real. Nevertheless, given the record, the IJ's determination that Pathmakanthan did not experience past persecution is supported by substantial evidence. The context of the single death threat to which he was subject is not so severe that no reasonable person could fail to find that he was subject to persecution. *Toptchev*, 295 F.3d at 720.

B. *Substantial Evidence Supports the IJ's Determination That Petitioner Does Not Have a Well-Founded Fear of Future Persecution*

Past persecution leads to a rebuttable presumption of future persecution. *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002). In the present case, though, where Petitioner has not established past persecution, he may still demonstrate a well-founded fear of future persecution. Because the IJ found him to be credible, we take Petitioner at his word that he has a subjective fear of being persecuted upon his return to Sri Lanka. But a subjective fear is not enough in itself; rather, an asylum seeker must also demonstrate that the fear of future persecution is objectively reasonable. *See Ayele v. Holder*, 564 F.3d 862, 868 (7th Cir. 2009).

We address two possible iterations of future persecution. First, even though living under the death threat did not amount to past persecution, we will consider whether the threat is sufficiently grave to give rise to a well-founded fear of future persecution. Second, we will consider petitioner's claims of persecution in general against young Tamil males from the Northern Province of Sri Lanka.

Taking the former question first, we agree with the IJ that the single death threat made to to Pathmakanthan does not render his fear of future persecution objectively reasonable. While any threat of death is serious, we do not believe that this particular threat creates a well-founded fear of future persecution because (1) the threat was an isolated incident, not part of a series of ongoing

threats, (2) the Petitioner was released within hours and without having suffered any physical harm, and (to a lesser degree) (3) to the extent the threat may have been based on Petitioner's perceived membership in the Tamil Tigers, that group's military defeat at the hands of the government in 2009 could conceivably obviate the motivation that underlay the single threat to which Pathmakanthan was subject. *See* U.S. STATE DEP'T, 2009 COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES: SRI LANKA (noting that the government declared victory over the Tigers on May 18, 2009); *Balogun v. Ashcroft*, 374 F.3d 492, 506-07 (7th Cir. 2004) (holding that we may take judicial notice of country conditions documented in State Department reports).

Petitioner contends that the Sri Lankan government has an ongoing pattern and practice of persecuting young Tamil males from the Northern Province and that he would be subject to this persecution as a member of this ethnic group. We acknowledge that persecution can be directed at an entire subset of a population, and asylum can be granted on such a basis. *See* 8 C.F.R. § 208.13(b)(2)(iii). Yet, this provision is very limited and we hold such claims to a high standard. "There must be a 'systematic, pervasive, or organized' effort to kill, imprison, or severely injure members of the protected group, and this effort must be perpetrated or tolerated by state actors." *Mitreva v. Gonzales*, 417 F.3d 761, 765 (7th Cir. 2005); *see also Mitev*, 67 F.3d at 1330 ("A more generous interpretation of 'persecution' would 'qualify the entire population of many war-torn nations for asylum' and thus make congressionally-imposed limitations

on immigration virtually meaningless." *Id.* (quoting *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir. 1992)). "Consequently, conditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Sivaainkaran*, 972 F.2d at 165; *see also Kaharudin v. Gonzales*, 500 F.3d 619, 623-25 (7th Cir. 2007).

Petitioner has presented anecdotal evidence of harassment by Sri Lankan government authorities and other evidence such as U.S. State Department reports. This evidence demonstrates a harsh, battle-torn environment, in which the Tamils as a group are often ill-treated. Nevertheless, we agree with the IJ that many of the detentions and interrogations described by Pathmakanthan may have been necessary evils for a government entrenched in a ferocious civil war with a terrorist group. And despite the fact that the State Department's 2009 report on Sri Lanka paints a grim picture for Tamils generally, it does not necessarily demonstrate that the Sri Lankan government persecutes young Tamil males. What Petitioner has demonstrated does not rise to the high standard we set for considering entire ethnicities (or even large subsets of them) eligible for blanket asylum.[2]

---

[2] In 2009 we made a determination that the practices of the Sri Lankan government did not rise to a pattern or practice of persecution of ethnic Tamils. *Krishnapillai v. Holder*, 563 F.3d 606 (7th Cir. 2009). Petitioner in this case has relied on much of the same background information. Although circumstances for male Tamils in Sri Lanka may have changed since the Tigers' military defeat, any argument as to changed country conditions

(continued...)

Thus, substantial evidence supports the BIA and IJ's finding that Petitioner has not established past persecution or a well-founded fear of future persecution.

C. *Petitioner Is Not Entitled to Relief Under the Convention Against Torture*

The CAT standard presents a higher threshold than the asylum standard. *Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004). Because Petitioner has not met the burden to establish asylum, he has not met the burden for protection under the CAT. *See, e.g.*, *Ishitiaq v. Holder*, 578 F.3d 712, 718 (7th Cir. 2009). Petitioner contends that he will be subject to torture as a failed asylum seeker returning to Sri Lanka, even if he has not shown a pattern of torture that would otherwise afford protection under the CAT. Nevertheless, he has not met the burden of showing that he is more likely than not to be tortured upon his return because of his status as a failed asylum seeker, or for any other reason.

D. *The BIA Did Not Deny Petitioner Due Process of Law*

Petitioner claims that the BIA confused his case with another and therefore denied him due process of law. There are a few instances where the BIA fumbled the language, most notably calling Petitioner's request an "adjustment of status" rather than "withholding of re-

---

(...continued)

should be presented to the BIA at the first instance. 8 C.F.R. § 1003.2(c)(3)(ii).

moval." While this raises the possibility of confusion, a reading of the entire decision makes it apparent that this was a semantic error and that the BIA did fully consider Petitioner's unique circumstances. This error was therefore harmless. Likewise, the BIA's failure to expound on the fact that Petitioner would be a failed asylum seeker returning to Sri Lanka does not mean it did not consider it; denying asylum obviously results in his being a failed asylum seeker. The BIA did not deny Petitioner's due-process rights.

E.  *The BIA Did Not Abuse its Discretion in Denying Petitioner's Motion to Reopen*

On September 26, 2008, Petitioner filed a motion to reopen with the BIA, arguing that conditions in Sri Lanka had changed in light of the breakdown of a cease-fire between the Tigers and Sri Lankan government. In support of his motion, he submitted the 2007 Country Report on Human Rights Practices, amongst many other documents. On October 23, 2008, the BIA denied the motion on the grounds that it was untimely filed and the evidence submitted in support was not sufficiently strong to show changed country conditions for the purpose of 8 C.F.R. § 1003.2(c)(3)(ii). Pathmakanthan has also petitioned for review of this order of the BIA.

We note the government's November 3, 2008, motion to dismiss for lack of jurisdiction at the outset. This motion will be denied in light of the Supreme Court's decision in *Kucana v. Holder*, which held that federal courts have jurisdiction to review administrative deci-

sions to reopen removal proceedings. 130 S. Ct. 827, 840 (2010).

We review Pathmakanthan's petition for review of the Board's denial of his motion to reopen for abuse of discretion. *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007). We deny the petition because the decision of the BIA was supported by rational explanation. *Pelinkovic v. Ashcroft*, 366 F.3d 532, 536 (7th Cir. 2004). Nor did it inexplicably depart from established policies or rest on an impermissible basis. *Id.* Specifically, the BIA correctly observed that the information contained in the 2007 Country Report predated the IJ's January 2008 decision. The Board also noted that the materials submitted by Pathmakanthan revealed that fighting had been ongoing since 2006, notwithstanding the cease-fire, so the official end of the truce in 2008 was not sufficient to show changed country conditions. Nor did the materials reveal that conditions for Tamils in the country had worsened due to the end of the cease-fire. Therefore, the BIA did not abuse its discretion in denying Petitioner's motion to reopen.

Nevertheless, we note with some concern the State Department's 2009 report on Sri Lanka, which paints a grim picture for Tamils generally and young male Tamils in particular. 2009 COUNTRY REPORTS: SRI LANKA (observing that "the overwhelming majority of victims of human rights violations . . . were young male Tamils" and noting that "[i]n July the UN High Commissioner for Refugees (UNHCR) reaffirmed his recommendation that Tamils from and in the north be eligible for asylum

status given the human rights situation in the country"). Given that the situation in Sri Lanka may have changed markedly since Pathmakanthan filed his last motion to reopen, he may wish to file another motion to reopen with the BIA in light of changed country conditions since the time of the hearing. *See* 8 C.F.R. § 1003.2(c)(3)(ii); *Asani v. INS*, 154 F.3d 719, 725 n.2 (7th Cir. 1998).

### III.  CONCLUSION

For the foregoing reasons, the government's motion to dismiss for lack of jurisdiction and the consolidated petitions for review are

DENIED.