# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1691

ZHOU JI NI,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A72-368-644

ARGUED DECEMBER 8, 2010—DECIDED MARCH 25, 2011

Before FLAUM and EVANS, *Circuit Judges*, and
MCCUSKEY, *District Judge.**

FLAUM, *Circuit Judge.* Nearly three decades ago, Chinese authorities detained Zhou Ji Ni's parents for three days. Like him, Ni's parents were Christians. They experienced firsthand the Chinese government's unease with the

* Hon. Michael P. McCuskey, of the Central District of Illinois, sitting by designation.

notion of an authority higher than it. For the three days that Ni's parents were held, authorities beat and threatened them on account of their religious beliefs.

The base treatment that his parents suffered is dated, however, as the incident occurred in roughly 1982, several years before Ni came to America. Relying on the incident, as well as a handful of others, Ni contends that he holds a well-founded fear of persecution. He therefore seeks to curb the U.S. government's efforts to deport him: he seeks asylum and withholding of deportation under the Immigration and Nationality Act. The Board of Immigration Appeals (the "Board") concluded that Ni failed to establish both that he himself had been the victim of past persecution and that he was exposed to an individualized risk of future persecution. Because the Board's determination was supported by substantial evidence, we deny Ni's petition for review.

## I. Background

Ni is thirty-eight years old. The details of his arrival in the United States are a bit sketchy, although he estimates that he came to this country toward the tail-end of 1990. He testified that he flew from Beijing to Belize and then drove to Mexico. After paying $28,000 to a smuggler, he was secreted across the U.S. border. In 1994, Ni went to authorities and filed an asylum application in an effort to purge the taint of his illegal entry. The

Government[1] denied Ni's application and issued an order to show cause why he was not subject to deportation under the Immigration and Nationality Act. Ni never entered an appearance, and the case was administratively closed in 1995.

Some years later, Ni found himself before an immigration judge in New York City, as the Government renewed its efforts to deport him for being an illegal alien. He conceded, then as now, that he was deportable, *see* 8 U.S.C. § 1227(a)(1)(B), but sought asylum or withholding of deportation on the ground that he has a well-founded fear of religious persecution in China.[2] The case was transferred to an immigration judge in Chicago, where a hearing was held.

Most of the evidence at Ni's hearing was documentary in form and related to country conditions in China. The

---

[1] Ni filed his application with the since-disbanded Immigration and Naturalization Service, most of whose functions are now carried out by agencies within the Department of Homeland Security. We refer to the agencies collectively as the "Government."

[2] Ni's primary argument before the immigration judge was that he could be sterilized for violating China's one-child policy, and he also argued that deporting him would violate the United Nations Convention Against Torture. *See* 8 C.F.R. § 208.16(c). He abandoned his sterilization argument before appealing to the Board. In his opening brief with us, he has included essentially no argument regarding the Convention Against Torture. That leaves us with only his arguments for asylum and withholding of deportation based on religious persecution.

most important were reports authored by the United States Department of State. The reports show, among other things, that the Chinese government "seeks to restrict religious practices to government-sanctioned organizations and registered places of worship" to ensure that the Communist Party retains its firm grip on Chinese society. *E.g.*, United States Department of State, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2007: CHINA 16 (Mar. 11, 2008) (hereinafter CHINA REPORT) (discussing efforts to "control and regulate" religious groups). Few Christian churches are officially permitted to operate—those that do must hew to certain teachings, such as a tenet that communism and Christianity are compatible. Churches that do not register with Chinese authorities, out of conscience or fear, experience every-thing from quiet toleration to outright repression. United States Department of State, CHINA: PROFILE OF ASYLUM CLAIMS AND COUNTRY CONDITIONS 5, 7 (May 2007) (hereinafter CHINA PROFILE). In some places, local security officials make threats, demolish unregistered property, interrogate or arrest adherents, and commit severe physical abuse. *Id.* In other places, however, "house churches" with hundreds of members meet openly "with full knowledge of local authorities, who characterized the meetings as informal gatherings." CHINA REPORT at 17. We reviewed the voluminous record, and if any item of documentary evidence sheds light on conditions where Ni lived—the Dongqi section of Fuzhou City, in the Fujian Province—neither party

has identified it for us.[3]

The only testimonial evidence at the hearing was offered by Ni. He testified that he is a practicing Christian, although he currently lacks time to attend religious services. He left China because the government "suppressed and bullied the public" and prohibited his parents from attending services or practicing their religion at home. In fleshing out his weariness of the Chinese government, Ni pointed to a handful of incidents carried out by Chinese authorities. First, officials threatened his parents and warned them on three separate occasions not to secretly practice their Christian faith. Second, authorities came to the family's house in the late 1970s, removing a cross from their home and ordering them not to attend religious services. Third, Ni's parents were arrested and detained for three days in the early 1980s, when Ni was approximately ten years old, after they failed to bend to intimidation. During the detention, his parents were beaten and threatened. Fourth, Ni himself was warned by officials and school teachers, when he was seven or eight years old, not to practice Christianity. He indicated that people at school "would look at us in a very weird way." The immigration judge concluded that the testimony was credible.

---

[3] State Department reports discuss forced sterilizations in the Fujian Province, a punishment doled out to some who violate China's one-child policy. Ni has fathered more than one child, but has abandoned his efforts to procure asylum on that basis.

Although the immigration judge accorded "full evidentiary weight" to Ni's testimony, he concluded that it was not particularly hefty. Specifically, the immigration judge reasoned that Ni did not provide much detail about the actions of Chinese officials, and the generalities he did offer painted a picture of harassment rather than persecution—at least with respect to Ni. (The immigration judge intimated, and the Board agreed, that the outcome might have been different had Ni's parents been seeking asylum.) Likewise, the evidence did not establish a well-founded fear of future persecution based on an *individualized* risk to Ni. The Board dismissed his appeal, agreeing with (though not explicitly adopting) the immigration judge's ruling. The dismissal order echoed much of the analysis in the immigration judge's decision, adding that Ni had not established that the Chinese government engages in a pattern or practice of persecuting Christians.

Ni then filed his petition for review with us.

## II.  Discussion

Under the Immigration and Nationality Act, the Attorney General has discretion to grant asylum to an alien who meets the statutory definition of a refugee. 8 U.S.C. § 1158(a). A refugee is defined as a person who is outside the country of his nationality and is unable or unwilling to return "because of persecution or a well-founded fear of persecution on account of" various traits and beliefs, including religion. 8 U.S.C. § 1101(42). The term persecution, however, is not defined in the Im-

migration and Nationality Act. Consistent with the Board and other courts, we describe persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Tamas-Mercea v. Reno*, 222 F.3d 417, 424 (7th Cir. 2000). Although the concept of persecution is hardly rigid, we have distinguished it from "mere harassment." *Bereza v. INS*, 115 F.3d 468, 472 (7th Cir. 1997) (quotation marks omitted). A person seeking asylum bears the burden of establishing eligibility for it. 8 C.F.R. § 208.13(a).

In this case, the Board concluded that Ni was ineligible for asylum, analyzing both routes for obtaining refugee status—past persecution or a well-founded, objectively reasonable fear of future persecution. *Lin v. Holder*, 620 F.3d 807, 810 (7th Cir. 2010). (We review the Board's order because it did not adopt the immigration judge's decision. *E.g.*, *Vahora v. Holder*, 626 F.3d 907, 912 (7th Cir. 2010).) We will uphold the Board's determination so long as it was supported by substantial evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (explaining that the agency's determination can be reversed "only if the evidence . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed"); *Martinez-Buendia v. Holder*, 616 F.3d 711, 715 (7th Cir. 2010). In this case, substantial evidence supported the Board's asylum determination with respect to both past persecution and a well-founded fear of future persecution.

### A.  Past Persecution

Past conduct by the Chinese government toward Ni and his family, the Board ruled, did not establish that Ni was subject to past persecution. The finding matters. When a petitioner can establish that he was the victim of past persecution, it gives rise to a rebuttable presumption that he has a well-founded fear of persecution in the future. 8 C.F.R. § 208.13(b)(1).

In general, an asylum applicant cannot rely on "derivative persecution" to establish that he was subjected to persecution in the past. *E.g.*, *Firmansjah v. Gonzales*, 424 F.3d 598, 605 (7th Cir. 2005); *Ambati v. Reno*, 233 F.3d 1054, 1060 (7th Cir. 2000); *Tamas-Mercea*, 222 F.3d at 424 (upholding the agency's finding that petitioner was not subject to past persecution when his father, grandfather, and uncle were arrested and beaten for opposing government policies); *Bereza*, 115 F.3d at 475-76 (mother's imprisonment did not amount to persecution of petitioner). Perhaps a better term for that unlikely-to-persuade argument, however, would be persecution by proxy, for we have observed that a different outcome may be warranted in some circumstances. In limited cases, the harm visited on one person *is* harm visited on another. In that sense persecution is "derivative" but may nonetheless support an asylum claim based on past persecution. For example, "If . . . your child [is] killed . . . in order to harm you, the fact that you are not touched does not mean that those acts cannot constitute persecution of you." *Gatimi v. Holder*, 578 F.3d 611, 617 (7th Cir. 2009); *see also Shu Wen Sun v. Bd. of Immigration Appeals*, 510 F.3d 377, 381 & n.5 (2d Cir. 2007);

*Tamas-Mercea*, 222 F.3d at 425 (acknowledging the possibility that "having one's children forcibly taken, killed, or kidnapped might rise to the level of persecution" if the acts were on account of petitioner's statutorily protected characteristics or beliefs).

The wrinkle is useful as a conceptual matter but unhelpful to Ni, as he did not argue that his family was seized and beaten on account of his Christianity in an effort to persecute him (unlikely given his age at the time of his parents' arrest). The Board therefore committed no error in concluding that Ni was not persecuted when his parents were arrested. Likewise, the Board did not err in concluding that the other acts that Ni describes—the threats to his family, the visit by officials to his house, the removal of a cross from his home, and the warnings Ni himself received—did not rise to the level of persecution, at least on the generality-heavy record before it. After all, Ni himself was never arrested, and the acts against him are better characterized as harassment. *E.g.*, *Santosa v. Mukasey*, 528 F.3d 88, 92-93 (1st Cir. 2008) (isolated bullying incidents when petitioner was a child did not establish past persecution); *Mitreva v. Gonzales*, 417 F.3d 761, 764 (7th Cir. 2005) (childhood incidents, including "a child's toy set on fire in [petitioner's] family's backyard . . . and several incidents in which street toughs threw rocks through [the] family's windows . . . are better characterized as harassment and discrimination" rather than persecution). To be sure, a threat may be more severe, all other things being equal, when its target is a child, but in most cases "threats in and of themselves will not compel a finding of past perse-

cution." *Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006); *see also Kantoni v. Gonzales*, 461 F.3d 894, 898 (7th Cir. 2006) (a credible threat of "very severe measures" that causes a person to give up religious views is persecution); *Boykov v. INS,* 109 F.3d 413, 416 (7th Cir. 1997) (acknowledging that threats "of a most immediate and menacing nature" might constitute persecution). We look to the entire factual picture surrounding Ni's asylum application, *Bejko*, 468 F.3d at 486, and nothing takes his case out of the general rule. The unfriendly looks shot by his classmates and warnings from officials were doubtless unpleasant, particularly given his age, but the record does not compel a finding of persecution.

### B. Fear of Future Persecution

Ni's effort to independently establish a well-founded fear of future persecution fares no better. The Government does not appear to question whether Ni holds a subjective fear of future persecution. Rather, his effort founders on the reasonableness component of his asylum claim, despite some evidence in favor of his position. Not only did Chinese officials hound him, but his parents were arrested for being Christian and were detained for three days. During that time, they were beaten and threatened. Because of Ni's close association with them, it adds credence to his fears that he could be subjected to similar treatment. *Mabasa v. Gonzales*, 455 F.3d 740, 746 (7th Cir. 2006) (persecution of an applicant's family is relevant to determining whether an asylum applicant's fear is well-founded).

That does not end the analysis, however. First, the acts that Ni relies upon occurred between roughly 1977 and 1982 and are not viewed as particularly severe under the governing case law. *Cf. Skalak v. INS*, 944 F.2d 364, 365 (7th Cir. 1991). And Ni remained in China for roughly eight more years, apparently without incident. The eight-year silence is unhelpful to his asylum claim. *Ambati*, 233 F.3d at 1060-61 (reasoning that the absence of harm over a five-year period undermined the petitioner's application for asylum). Similarly, Ni has offered no evidence that, since his departure from the country, Chinese officials have continued to target his family. If his family continued to practice Christianity, yet suffered no further incidents, then his claim is significantly weakened. *Id.* Indeed, the absence of evidence on this score is puzzling. Ni's parents were visiting Chicago on the day of his hearing, but did not attend, offer testimony, or furnish other evidence. Of course, Ni had the burden of establishing asylum eligibility and the "fail[ure] to present reasonably available corroborative evidence" bolsters the Board's determination. *Kyaw Zwar Tun v. INS*, 445 F.3d 554, 568 (2d Cir. 2006).

Returning from the evidentiary void to the material that was offered, the handful of dated incidents from Ni's childhood left the Board with the country-conditions evidence. Ni argues that the Board failed to consider the reports "adequately," but the record does not support that position. The Board correctly noted that the State Department reports on Chinese repression of Christianity tell an uneven story: in some places adherents experience persecution, but in other places they do not.

Given the absence of evidence or argument related to conditions where Ni lived, he did not meet the exacting standards for establishing persecution based on a pattern or practice of persecution. *E.g.*, *Pathmakanthan v. Holder*, 612 F.3d 618, 624-25 (7th Cir. 2010) (acknowledging that in limited circumstances persecution may be directed at an entire subset of a population but reiterating that a high standard applies to such claims).

Nor did Ni match up the country-conditions evidence with other record evidence to establish that he faced an individualized risk of persecution. For instance, we do not know anything about conditions in the area to which Ni presumably will return, nor do we know if Ni would be able to organize his affairs in a way that would allow him to avoid persecution at relatively little cost. *See* 8 C.F.R. § 208.13(b)(2)(ii) ("An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country . . . if under all the circumstances it would be reasonable to expect the applicant to do so."). In a similar vein, the State Department reports say that members of sanctioned churches do not experience persecution, *e.g.*, CHINA REPORT at 7, but we do not know if Ni's former or intended church is among their number. And although Ni intimates that the Board did not consider evidence that would have proved helpful to his claim, he does not identify what evidence was overlooked.

In sum, because the events that Ni relied on do not rise to the level of persecution and occurred long in the past, the Board was not required to lend them partic-

ular weight. That left Ni with the country-conditions evidence, which, untethered from facts establishing an individualized risk of persecution, did not further his case. Thus, the Board's asylum-eligibility determination was supported by substantial evidence. Finally, given the conclusion that Ni has not established eligibility for asylum, he necessarily cannot satisfy the more stringent standard for withholding of deportation. *See Bhatt v. Reno*, 172 F.3d 978, 982 (7th Cir. 1999).

### III.  Conclusion

For the reasons set forth above, Ni's petition for review is DENIED.