NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued August 3, 2011
Decided August 25, 2011

*Before*

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 11-1235

| | |
|---|---|
| BLANCA MENDEZ-GARCIA, <br> *Petitioner*, | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | A088 351 364 |
| ERIC H. HOLDER, JR., <br> Attorney General of the United States, <br> *Respondent*. | |

## O R D E R

Blanca Mendez-Garcia, a citizen of Guatemala, petitions for review of an order of the Board of Immigration Appeals upholding an Immigration Judge's denial of asylum and related relief. We deny the petition.

Mendez-Garcia entered the United States (for the second time) without travel documents in 2008 and timely applied for asylum and withholding of removal. She did not apply for relief under the Convention Against Torture, although the IJ and the Board later denied CAT relief. As relevant here, she claimed that Florencio Diaz, her ex-husband and the father of her daughter, persecuted her on account of her membership in two particular social groups: married women unable to leave their abusive husbands in Guatemala, and (after she separated from him) women who have finally left their abusive husbands. She

further claimed that he would continue to persecute her for her membership in the latter group.

Mendez-Garcia's marriage to Diaz, which began in 2000, was marred by instances of shoving, unspecified psychological mistreatment, and his demand that she cook and clean for him and his family. According to Mendez-Garcia's sworn declaration, Diaz hit her when she was pregnant with their daughter, but she later clarified at a hearing before an IJ that she meant he had slapped her once. After their daughter Anayeli was born, Mendez-Garcia testified, she separated from Diaz and stayed with a friend for two months in a nearby town, then headed to the United States alone in 2002 to earn money. Anayeli remained in Guatemala under the care of Mendez-Garcia's sister.

According to her testimony and declaration, Mendez-Garcia returned to Guatemala about three years later, in 2005, after her mother, her siblings, and Diaz threatened to report her for child abandonment and take legal custody of Anayeli. Some time after her return, Diaz happened upon Mendez-Garcia in town and warned her that he "had a right over" her. Another time he found her at her sister's home and "tried" to hit her with a belt. Although he told Mendez-Garcia that he was going to take their daughter, he never sought legal custody or tried to kidnap her.

Finally, some time in 2007, Mendez-Garcia hired a lawyer, procured a divorce, and won sole custody of Anayeli. These actions, she testified, caused Diaz's threats to worsen. Once, when he encountered her on the street, he warned her that he had friends who could put her in a car and make her disappear, and he used a telephone to make at least three other death threats (the specifics of what he said are unclear from the record).

Mendez-Garcia never asked for a restraining order or police protection. Instead, she returned to the United States with her daughter in early February 2008, was apprehended near the border, and told an asylum officer that she feared her ex-husband in Guatemala. Less than two months later, and apparently after her release from a brief detention, she married Jose Villagres, another Guatemalan citizen who resides in the United States without status. The record is hazy on the details of their courtship. Soon after her marriage, Mendez-Garcia filed her application for asylum.

In February 2009, Mendez-Garcia appeared by televideo from Kansas City, Missouri, before a Chicago-based IJ. She related her story, introduced letters from friends and family attesting to Diaz's continued desire to kill her, and, under questioning, testified that she had not sought government protection from Diaz in Guatemala because he was "friends with the governor of the village," and because the police "don't do anything." To bolster the latter contention, Mendez-Garcia introduced U.S. State Department Reports on Human Rights Practices from 2007 and 2008, both of which referred in nearly identical language to

rampant violence against and killings of women; low prosecution rates for rape and domestic violence; and inadequate police training on domestic violence. Although Guatemalan judges did issue restraining orders against abusive men, their effectiveness was sometimes hampered by police reluctance to respond to domestic violence calls. The 2008 report added that a recent law banned "femicide" and established stronger penalties and new investigative units for dealing with crime against women.

Mendez-Garcia also introduced a report by a United Nations Special Rapporteur about violence against women in Guatemala, based on a visit the Rapporteur made to that country over six days in 2004. The Rapporteur blamed widespread violence against women, and the perpetrators' impunity, for women's lack of confidence in the government. Moreover, the Rapporteur cited police corruption, inadequate investigation, a low prosecution rate, and bureaucrats' complaints of scant resources for protecting women.

The IJ denied all forms of relief, concluding that Mendez-Garcia had shown neither past persecution nor a well-founded fear of future persecution, nor that any harm she faced was on account of her membership in a particular social group. Mendez-Garcia appealed the IJ's decision to the Board, which dismissed the appeal. The Board concluded that Diaz's conduct was not severe enough to constitute past persecution, that Mendez-Garcia's fear of future persecution was unreasonable because Diaz had consistently failed to follow through on threats over the years, and that Mendez-Garcia had not adduced specific evidence that the Guatemalan government was unwilling or unable to protect her from Diaz. This petition for judicial review followed.

In this court, Mendez-Garcia challenges the Board's findings that she did not suffer past persecution and has no well-founded fear of future persecution. To obtain reversal, she must demonstrate that the record compels a conclusion contrary to the Board's. *See* 8 U.S.C. § 1252(b)(4); *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992). Because the Board issued its own decision, rather than merely adopting or supplementing the IJ's decision, we review the Board's order directly. *See Ni v. Holder*, 635 F.3d 1014, 1018 (7th Cir. 2011); *Moab v. Gonzales*, 500 F.3d 656, 659 (7th Cir. 2007). At the outset, the Attorney General concedes that the Board made no finding concerning Mendez-Garcia's particular social group, and assumes, for the limited purpose of this petition for review, that any harm she fears is on account of her membership in such a group. We do the same.

Mendez-Garcia first contends that the threats, physical abuse, and generalized "despair" she experienced in Guatemala rise to the level of past persecution. But, although unfulfilled threats can be probative of someone's future intent to persecute, they generally do not themselves constitute persecution—particularly in the absence of any past attempt to follow through on them. *Ni*, 635 F.3d at 1019; *Nzeve v. Holder*, 582 F.3d 678, 683 (7th Cir. 2009); *Bejko v. Gonzales*, 468 F.3d 482, 486 (7th Cir. 2006). Mendez-Garcia offers no reason

why her case lies outside this general rule. As for physical abuse, Diaz's slapping her once, shoving her, and swinging a belt in her direction involve less than "significant" physical force, and thus do not amount to persecution. *See Stanojkova v. Holder*, --- F.3d ---, ---, 2011 WL 2725850, at *4 (7th Cir. July 14, 2011). The record does not compel a finding that Diaz's abusive acts, taken together, amount to past persecution.

Mendez-Garcia, though, attempts to skirt cases like *Stanojkova* by speculating that, "rather than measuring the level of violence or depravity of the [allegedly persecutory] act or acts, perhaps we should be measuring the subjective impact on the victim." But she cites no judicial or administrative decisions adopting such a broad conception of past persecution, and we can find none.

Turning to future persecution, Mendez-Garcia argues that the Board relied too heavily on her failure to seek police protection after Diaz started making death threats, and gave too little weight to findings in the State Department and United Nations reports that Guatemalan authorities respond inadequately to domestic abuse. Because Diaz is a private (rather than governmental) actor, his deeds can be called "persecution" only if Mendez-Garcia shows that the Guatemalan government is unwilling or helpless to protect people like her. *Compare Gatimi v. Holder*, 578 F.3d 611, 616-17 (7th Cir. 2009) (Kenyan government helpless against Mungiki sect), *and Hor v. Gonzales*, 421 F.3d 497, 501-02 (7th Cir. 2005) (Algerian government helpless against radical Islamists), *with Chatta v. Mukasey*, 523 F.3d 748, 753 (7th Cir. 2008) (Pakistani government not helpless against religious sect), *and Garcia v. Gonzales*, 500 F.3d 615, 618-19 (7th Cir. 2007) (Colombian government not helpless against guerilla group). Specific findings in country reports may sometimes establish that contacting police would be futile. *See Poradisova v. Gonzales*, 420 F.3d 70, 76, 80 (2d Cir. 2005) (Jewish petitioners' failure to seek police protection from non-government actors explained by police antisemitism in Belarus).

But the reports that Mendez-Garcia submitted reflect only indirectly on the government's likely response to the situation she will face if returned to Guatemala. They speak broadly about high rates of rape and murder, low conviction numbers, and especially the police's reluctance to enforce restraining orders against some men who abuse their spouses, but shed little light on the question whether a divorcee, now remarried to another man, can obtain enforcement of a restraining order against her ex-husband. Although the Board might have discussed the country reports in greater detail, they do not compel reversal of the conclusion that Mendez-Garcia failed to shoulder her burden of demonstrating the Guatemalan government's unwillingness or inability to protect *her* from Diaz. (Neither are we compelled to infer from Diaz's friendship with someone in the local government that the police would acquiesce in future persecution of Mendez-Garcia, especially given her failure to discuss that friendship in the argument section of her brief.)

At all events, we are not compelled to reverse the Board's alternative finding that the time Mendez-Garcia and her daughter spent unharmed in Guatemala fatally undermines the reasonableness of her fear that Diaz will follow through on his threats. Although we do not dismiss threats lightly, whether they give rise to a well-founded fear of persecution in a particular case depends on their context. *See Pathmakanthan v. Holder*, 612 F.3d 618, 624 (7th Cir. 2010); *Nzeve*, 582 F.3d at 685. Here, Diaz's past violence includes shoving, a slap, and swinging a belt without making contact, none of which shows a propensity for murder. And Diaz has a substantial history of bluffing. When Mendez-Garcia left their daughter in Guatemala for three years, Diaz did not seek custody, although he threatened to do so. Then, from 2005 to 2008, he again warned Mendez-Garcia that he would somehow take Anayeli from her, but took no steps in that direction. During the same period, he asserted that he still had a "right" he planned to exercise over her, but did nothing about it. It is unclear from the record whether Diaz even bothered to participate in the 2007 divorce and custody proceedings, which happened about five years after the couple split. Finally, he made at least four death threats after the divorce, but did nothing to follow through before she left the country in 2008. This evidence permitted the Board to conclude that Diaz presents Mendez-Garcia with no real chance of death, violence, or the kidnaping of her daughter. And it does not compel us to conclude otherwise.

Finally, Mendez-Garcia does not question the Board's denial of withholding of removal and relief under the CAT, nor did she question the IJ's denial of these forms of relief when she appealed to the Board. Thus, she has waived any related claims. *See Haxhiu v. Mukasey*, 519 F.3d 685, 692 (7th Cir. 2008); *Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005).

Accordingly, we **DENY** the petition for review.